[806 NE2d 979, 774 NYS2d 866]

JOHN CHAMBERS et al., Respondents, v OLD STONE HILL ROAD ASSOCIATES et al., Appellants.

Argued January 13, 2004; decided February 24, 2004

## POINTS OF COUNSEL

*Snyder & Snyder, LLP,* Tarrytown (*David L. Snyder* and *Leslie J. Snyder* of counsel), for New York SMSA Limited Partnership, appellant. I. Because the decisions below are contrary to well-established public policy, they must be reversed. (*Matter of Cellular Tel. Co. v Rosenberg,* 82 NY2d 364; *Omnipoint Communications, Inc. v City of White Plains,* 175 F Supp 2d 697; *Crane Neck Assn. v New York City/Long Is. County Servs. Group,* 92 AD2d 119, 61 NY2d 154, 469 US 804; *Quinones v Board of Mgrs. of Regalwalk Condominium I,* 242 AD2d 52; *Board of Mgrs., Artist Lake Condominium v Rios,* 166 Misc 2d 381; *Bell v Gitlitz,* 65 Misc 2d 998, 38 AD2d 656; *Reno v American Civ. Liberties Union,* 521 US 844; *Lucas v Planning Bd. of Town of LaGrange,* 7 F Supp 2d 310; *Memphis Light, Gas & Water Div. v Craft,* 436 US 1; *Burgess v City of Houston,* 718 F2d 151.) II. The tower is not a "building" and hence is not prohibited by the covenant. (*Matter of Bell Atl. NYNEX Mobile v Lonergan,* 172 Misc 2d 317, 251 AD2d 660; *Proper v Southwestern Bell*

*Mobile Sys.,* 266 AD2d 607; *Matter of Jaffee v RCI Corp.,* 119 AD2d 854; *Thrun v Stromberg,* 136 AD2d 543; *Kaufman v Fass,* 302 AD2d 497; *Blueberries Gourmet v Aris Realty Corp.,* 291 AD2d 520; *E.M.R. Mgt. Corp. v Halstead Harrison Assoc.,* 299 AD2d 393; *Sunrise Plaza Assoc. v International Summit Equities Corp.,* 152 AD2d 561, 75 NY2d 703; *Battista v Pine Is. Park Assn.,* 28 AD2d 714; *Premium Point Park Assn. v Polar Bar,* 306 NY 507.) III. The decisions below should be reversed because, in refusing to grant relief from the covenant under RPAPL 1951, the court applied an incorrect standard, relied on impermissible evidence and failed to perform the requisite balancing test. (*Orange & Rockland Util. v Philwold Estates,* 52 NY2d 253; *Deak v Heathcote Assn.,* 191 AD2d 671; *Matter of Zimmerman v Seven Corners Dev.,* 237 AD2d 892; *Board of Educ., E. Irondequoit Cent. School Dist. v Doe,* 88 AD2d 108; *Rosenman Colin Freund Lewis & Cohen v Edelman,* 165 AD2d 533; *Town of Tonawanda v Ayler,* 68 NY2d 836; *Clintwood Manor v Adams,* 29 AD2d 278, 24 NY2d 759; *Bardach v Mayfair-Flushing Corp.,* 49 Misc 2d 380, 26 AD2d 620, 18 NY2d 580; *Goldstein v Rosenberg,* 191 App Div 492; *Pulitzer v Campbell,* 146 Misc 700.) IV. As a matter of law and equity, plaintiffs-respondents were not entitled to a mandatory injunction requiring removal of the tower. (*Goodfarb v Freedman,* 76 AD2d 565; *Forstmann v Joray Holding Co.,* 244 NY 22; *Village Greens Residents Assn. v Karolewicz,* 83 AD2d 550; *Syracuse Supply Co. v Railway Express Agency,* 45 Misc 2d 1000, 27 AD2d 635, 20 NY2d 718; *DiMarzo v Fast Trak Structures,* 298 AD2d 909; *Bell v Gitlitz,* 38 AD2d 656; *Sunrise Plaza Assoc. v International Summit Equities Corp.,* 288 AD2d 300; *Medvin v Grauer,* 46 AD2d 912; *Generalow v Steinberger,* 131 AD2d 634; *Horton v Niagara, Lockport & Ontario Power Co.,* 231 App Div 386.)

*Banks Shapiro Gettinger Waldinger & Brennan, LLP,* Mount Kisco (*Mona D. Shapiro* of counsel), for Old Stone Hill Road Associates, appellant. I. As a matter of law, because enforcement of the restrictive covenant would frustrate an important state and federal policy, it should not be enforced. (*Crane Neck Assn. v New York City/Long Is. County Servs. Group,* 61 NY2d 154; *Matter of Cellular Tel. Co. v Rosenberg,* 82 NY2d 364; *Quinones v Board of Mgrs. of Regalwalk Condominium I,* 242 AD2d 52; *Matter of Consolidated Edison Co. of N.Y. v Hoffman,* 43 NY2d 598; *Cellular Phone Taskforce v Federal Communications Commn.,* 205 F3d 82, 531 US 1070; *Sprint Spectrum, L.P. v Willoth,* 176 F3d 630; *Town of Amherst v Omnipoint Communications Enters., Inc.,* 173 F3d 9; *Nextel Partners, Inc. v Town of*

*Amherst,* 251 F Supp 2d 1187.) II. As a matter of law, the restrictive covenant may not be enforced to the extent that its enforcement would violate 47 USC § 332 (c) (7). (*Hillsborough County v Automated Med. Labs., Inc.,* 471 US 707; *Gibbons v Ogden,* 9 Wheat [22 US] 1; *Jones v Rath Packing Co.,* 430 US 519; *Fidelity Fed. Sav. & Loan Assn. v de La Cuesta,* 458 US 141; *English v General Elec. Co.,* 496 US 72; *Hines v Davidowitz,* 312 US 52; *Freightliner Corp. v Myrick,* 514 US 280; *Free v Bland,* 369 US 663; *Town of Amherst v Omnipoint Communications Enters., Inc.,* 173 F3d 9; *Sprint Spectrum, L.P. v Willoth,* 176 F3d 630.) III. As a matter of law, the restrictive covenant may not be enforced to the extent that its enforcement would violate 47 USC § 253. (*TCG N.Y., Inc. v City of White Plains,* 305 F3d 67; *New Jersey Payphone Assn., Inc. v Town of W. N.Y.,* 299 F3d 235; *City of Auburn v Qwest Corp.,* 260 F3d 1160; *Cippollone v Liggett Group, Inc.,* 505 US 504; *Shaw v Delta Air Lines, Inc.,* 463 US 85; *Medtronic, Inc. v Lohr,* 518 US 470; *Matter of Friends of Shawangunks v Knowlton,* 64 NY2d 387.)

*Wilson, Elser, Moskowitz, Edelman & Dicker LLP,* White Plains (*Steven M. Silverberg* and *Katherine Zalantis* of counsel), for respondents. I. Wireless telecommunications providers (not municipalities) select locations for wireless telecommunications facilities by entering into private agreements with landowners. Consequently, landowners (and not municipalities) are the first step in the process of locating wireless telecommunications facilities. (*Omnipoint Communications Enters., L.P. v Township of Nether Providence,* 232 F Supp 2d 430; *Matter of Consolidated Edison Co. of N.Y. v Hoffman,* 43 NY2d 598; *Matter of Consolidated Edison Co. of N.Y. v Lindsay,* 24 NY2d 309.) II. The Town Board's granting of the special permit does not prevent plaintiffs from enforcing the restrictive covenant. (*Matter of Friends of Shawangunks v Knowlton,* 64 NY2d 387.) III. The restrictive covenant does not violate a statutory or general public policy. (*Crane Neck Assn. v City of New York/Long Is. County Servs. Group,* 61 NY2d 154, 469 US 804; *Quinones v Board of Mgrs. of Regalwalk Condominium I,* 242 AD2d 52; *Board of Mgrs., Artist Lake Condominium v Rios,* 166 Misc 2d 381; *Sprint Spectrum, L.P. v Willoth,* 176 F3d 630; *Omnipoint Communications Enters., L.P. v Zoning Hearing Bd. of Easttown Twp.,* 331 F3d 386; *Second Generation Props., L.P. v Town of Pelham,* 313 F3d 620; *Matter of Cellular Tel. Co. v Rosenberg,* 82 NY2d 364; *Kemp v Rubin,* 298 NY 590; *Bell v Gitlitz,* 65 Misc 2d 998, 38 AD2d 656.) IV. The premises (the Adams Lane site) is not the only site for the facility. Consequently, removal of the facility is not equiv-

alent to a prohibition of service. (*New York SMSA Ltd. Partnership v Town of Clarkstown,* 99 F Supp 2d 381; *Airtouch Cellular v City of El Cajon,* 83 F Supp 2d 1158; *Sprint Spectrum, L.P. v Board of County Commrs. of Jefferson County,* 59 F Supp 2d 1101; *SiteTech Group Ltd. v Board of Zoning Appeals of Town of Brookhaven,* 140 F Supp 2d 255; *Cellular Tel. Co. v Town of Oyster Bay,* 166 F3d 490; *Suffolk Outdoor Adv. Co. v Hulse,* 43 NY2d 483.) V. The restrictive covenant is not vague. (*Goodfarb v Freedman,* 76 AD2d 565; *Matter of Bell Atl. NYNEX Mobile v Lonergan,* 172 Misc 2d 317, 251 AD2d 660; *Proper v Southwestern Bell Mobile Sys.,* 266 AD2d 607; *Jaffee v RCI Corp.,* 119 AD2d 854; *Mambretti v Poughkeepsie Galleria Co.,* 288 AD2d 443; *Battista v Pine Is. Park Assn.,* 28 AD2d 714; *Sprint Spectrum, L.P. v Board of Zoning Appeals of Town of Brookhaven,* 244 F Supp 2d 108; *Premium Point Park Assn. v Polar Bar,* 306 NY 507; *Verstandig's Florist v Board of Appeals of Town of Bethlehem,* 229 AD2d 851; *Mairs v Stevens,* 294 NY 806.) VI. The restrictive covenant is not unenforceable under RPAPL 1951. (*Farr v Newman,* 14 NY2d 183; *Southwestern Bell Mobile Sys., Inc. v Todd,* 244 F3d 51; *Second Generation Props., L.P. v Town of Pelham,* 313 F3d 620; *Orange & Rockland Util. v Philwold Estates,* 52 NY2d 253; *Deak v Heathcote Assn.,* 191 AD2d 671; *Garrett v Village of Asharoken,* 185 AD2d 873; *Cody v Fabiano & Sons,* 246 AD2d 726, 91 NY2d 814; *Fanning v Grosfent,* 58 AD2d 366; *Matter of Zimmerman v Seven Corners Dev.,* 237 AD2d 892; *Pulitzer v Campbell,* 146 Misc 700.) VII. Plaintiffs are entitled to a mandatory injunction requiring demolition of the facility. (*Goodfarb v Freedman,* 76 AD2d 565; *Westmoreland Assn. v West Cutter Estates,* 174 AD2d 144; *Jones v Fowler,* 201 AD2d 878.) VIII. A court's enforcement of the restrictive covenant would not have the effect of prohibiting service. (*Omnipoint Communications Enters., L.P. v Township of Nether Providence,* 232 F Supp 2d 430; *Anderson v Regan,* 53 NY2d 356; *People ex rel. Burby v Howland,* 155 NY 270; *Shelley v Kraemer,* 334 US 1; *Cippollone v Liggett, Inc.,* 505 US 504; *New York SMSA Ltd. Partnership v Town of Clarkstown,* 99 F Supp 2d 381; *Cellular Tel. Co. v Town of Oyster Bay,* 166 F3d 490; *Metronic, Inc. v Lohr,* 518 US 470; *Sprietsma v Mercury Mar.,* 537 US 51.) IX. The Town cannot protect its purported interests through its amicus brief. (*Russell v Board of Plumbing Examiners of County of Westchester,* 74 F Supp 2d 349, 242 F3d 367; *Rochdale Vil. v Harris,* 172 Misc 2d 758; *First Citizens Bank & Trust Co. v Saranac Riv. Power Corp.,* 246 App Div 672; *Central Hanover Bank & Trust Co. v Saranac Riv. Power Corp.,* 243

App Div 843; *Matter of Glenel Realty Corp. v Worthington,* 4 AD2d 702; *Matter of Greater N.Y. Health Care Facilities Assn. v DeBuono,* 91 NY2d 716; *15 E. 11th Apt. Corp. v Elghanayan,* 232 AD2d 289.)

*Bleakley Platt & Schmidt, LLP,* White Plains (*Robert D. Meade* of counsel), for Town of Pound Ridge, amicus curiae. Any removal of the facilities at issue in this action should be coordinated with the replacement of emergency communications apparatus of the Town of Pound Ridge located thereon.

**OPINION OF THE COURT**

Chief Judge KAYE.

Starting in 1957, nearly 50 years ago, the owner of a large tract of land in the Town of Pound Ridge, Westchester County, began conveying parcels with restrictive covenants to limit development on this land to single-family homes. Plaintiffs and defendant Old Stone Hill Road Associates are the current owners of several of these lots that are subject to covenants in a deed within the chain of title, duly recorded, prohibiting "any building except detached residential dwelling houses each for the occupancy and use of one family" and "any trade or business whatsoever." Appellants, Stone Hill and its lessee, now seek to avoid enforcement of these covenants.

In November 1998, Stone Hill leased about 2,000 square feet on one lot, with a right of access on an adjacent lot, to defendant New York SMSA Limited Partnership doing business as Verizon Wireless. The purpose was for SMSA to construct a facility—an antenna mounted on a 120-foot monopole with a two-story, 660-square-foot equipment storage shed disguised as a barn located at the base and parking space for maintenance vehicles—to provide cellular telephone service in the town and surrounding area. The lease to SMSA touched off a series of events leading to the present litigation, which essentially pits private contractual rights against what defendants claim is the public policy of the Telecommunications Act of 1996 (TCA) (47 USC § 151 *et seq.,* as added by Pub L 104-104, 110 US Stat 56) regarding wireless telecommunications facilities.

In April 2000, after considering 18 alternative sites over a period of 15 months, the Town Board approved SMSA's application for a special permit to construct the facility on Stone Hill's property. Several of these sites had been evaluated in combination with other locations so that they could be compared with the proposed single site on Stone Hill's property. Since the Stone

Hill site was in an exclusively residential area, the Town Board initially expressed a preference for the Town's own "Highway Garage/DPW" site. In fact, the Stone Hill site was taken off the Town Board agenda during the review process, but placed back on the agenda for consideration just before the Board issued the special permit.

Regardless, the Board ultimately rejected all of the alternatives, in part because adequate coverage could not be secured on a single site and might in the future require construction at an additional location. Plaintiffs initiated two lawsuits: the present action to enforce the restrictive covenants brought in March 2000, and a CPLR article 78 proceeding to challenge the Town's approval of the special permit brought in May 2000.

Thereafter, in June 2000, SMSA obtained a building permit and immediately began construction, which was substantially complete in September 2000. Plaintiffs meanwhile moved for partial summary judgment on their claims for an injunction based on the restrictive covenants. Supreme Court on November 19, 2001, decided both cases. The court issued a permanent injunction against violation of the restrictive covenants, ordered removal of the facility and dismissed defendants' counterclaim to extinguish the restrictive covenants pursuant to RPAPL 1951 (*Chambers v Old Stone Hill Rd. Assoc.*, Sup Ct, Westchester County, Nov. 19, 2001, Cowhey, J., Index No. 00-04475). Separately, the court dismissed the article 78 proceeding, holding that the Town had acted properly; in the court's words, "upon a review of the record, it is plain that the DPW site [the alternative site urged by plaintiffs] cannot provide the necessary adequate coverage and adequate capacity to the Town" (*Matter of Sorkin v Simpkins*, Sup Ct, Westchester County, Nov. 19, 2001, Cowhey, J., Index No. 7498/00).

On defendants' appeal, the Appellate Division affirmed, concluding that the restrictive covenants evinced an intent to limit the area to residential use, and rejecting defendants' hardship claim because "[w]here, as here, the servient property owner's hardships are largely self-created, they do not tip the balance of the equities in favor of extinguishing the restrictive covenants" (303 AD2d 536, 537 [2d Dept 2003]). The Court also rejected defendants' public policy arguments, stating that the TCA "does not expressly or impliedly preempt the power of private citizens to enforce restrictive covenants or otherwise limit the judicial enforcement of those private agreements" (*id.* at 538).

Defendants now place two arguments before us. First, they assert that enforcement of the restrictive covenants offends public policy, which should trump plaintiffs' contractual rights. Second, they claim that the hardships to defendants outweigh the benefits to plaintiffs, and that the restrictive covenants must therefore be extinguished under RPAPL 1951. We conclude that Supreme Court and the Appellate Division correctly rejected both arguments.

Restrictive covenants will be enforced when the intention of the parties is clear and the limitation is reasonable and not offensive to public policy (*see e.g. Reed, Roberts Assoc. v Strauman*, 40 NY2d 303, 307 [1976]; *Silverstein v Shell Oil Co.*, 33 NY2d 950, 950-951 [1974], *affg* 40 AD2d 34, 36 [3d Dept 1972]; *Bovin v Galitzka*, 250 NY 228, 231-232 [1929]). Here, the intention of the restrictive covenants was clearly to preserve the residential character of the neighborhood by limiting the area to residential use, which limitation is reasonable. Plainly too, these covenants do not offend public policy.

## Public Policy

■ Congress enacted the Telecommunications Act of 1996 to encourage development and reduce regulation of telecommunications technologies (47 USC § 151). Section 332 of the TCA furthers this purpose by making it unlawful to prohibit wireless services: "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services" (47 USC § 332 [c] [7] [B] [i] [II]). Asserting that the restrictive covenants offend the public policy embodied in the statute, defendants claim that enforcing the covenants will essentially prohibit personal wireless services in the Town of Pound Ridge. Additionally, defendants urge that, if the Appellate Division is affirmed and the tower removed, the Town's authority will be negated. Neither argument has merit.

Upholding plaintiffs' contractual rights in no way denies wireless telecommunications services in the Town of Pound Ridge. The Town Resolution stated that the Stone Hill site "has the best chance of being the only site necessary to meet the needs and demands for wireless telecommunication services for the Town of Pound Ridge." But despite defendants' insistence, the Town's determination that the Stone Hill site might be the best single-site solution is not a determination that the Stone Hill

site was the only site for the facility (*see e.g. SiteTech Group Ltd. v Board of Zoning Appeals of Town of Brookhaven*, 140 F Supp 2d 255, 264-265 [ED NY 2001] [upholding a zoning board's denial of a special permit on the ground that there were alternative sites even though the alternative sites would not have completely closed the gaps in service and would have required additional antennas]). The Town, as amicus, concedes the existence of another site or sites on which to locate the facility. Indeed, up to the very day the Town Board selected Stone Hill, alternative sites like the Highway Garage/DPW site were under active consideration. In short, these covenants do not prohibit or have the effect of prohibiting the provision of wireless telecommunications services in the Town of Pound Ridge.

Additionally, defendants assert that the Town's authority to grant the special permit will be negated if the restrictive covenants are enforced and the tower removed. The Town's issuance of the special permit to construct the facility is, however, separate and distinct from plaintiffs' right to enforce the restrictive covenants, a right only plaintiffs can enforce. As we observed in *Matter of Friends of Shawangunks v Knowlton* (64 NY2d 387, 392 [1985]):

> "The use that may be made of land under a zoning ordinance and the use of the same land under an easement or restrictive covenant are, as a general rule, separate and distinct matters, the ordinance being a legislative enactment and the easement or covenant a matter of private agreement."

The Court went on to make clear that "a particular use of land may be enjoined as in violation of a restrictive covenant, although the use is permissible under the zoning ordinance and the issuance of a permit for a use allowed by a zoning ordinance may not be denied because the proposed use would be in violation of a restrictive covenant" (*id.* [citations omitted]; *see also* 2 Salkin, New York Zoning Law and Practice § 34:02 [4th ed] ["enforcement (of a zoning ordinance) will be enjoined for a violation of a restrictive covenant"]). In approving a special permit, a municipality determines only that the application complies with the municipality's standards and conditions contained in the zoning ordinance (*see Matter of North Shore Steak House v Board of Appeals of Inc. Vil. of Thomaston*, 30 NY2d 238, 243-244 [1972]; *Matter of Mobil Oil Corp. v Oaks*, 55 AD2d 809, 809-810 [4th Dept 1976]; 2 Salkin, New York Zoning Law and Practice § 30:01 [4th ed]).

Thus, in separately dismissing the article 78 proceeding challenging the Town's permit and enforcing the restrictive covenants—both on the same day—Supreme Court correctly refused to allow the Town Board's decision that the Stone Hill lot was an appropriate site for the facility to override plaintiffs' right to enforce the restrictive covenants. Defendants and the Town cannot negate the restrictive covenants by ignoring them and proceeding with the permit process and construction.

Finally, in arguing that the restrictive covenants offend public policy, defendants misread *Crane Neck Assn. v New York City/ Long Is. County Servs. Group* (61 NY2d 154 [1984]). In *Crane Neck*, the property in issue—leased to the government for use as a home for mentally disabled adults—was subject to a restrictive covenant that allowed only single-family dwellings. There, however, Mental Hygiene Law § 41.34 (f) explicitly preempted local laws and ordinances, defining a community residence for this purpose as a family unit. This Court extended the statute's explicit preemption to private covenants restricting the use of property to single-family dwellings because those agreements posed the same deterrent to effective implementation of the state policy favoring residences for the mentally disabled as the preempted local laws and ordinances. By contrast, Congress expressly recognized the importance of local land use authority in TCA § 332 (c) (7) (A), which makes clear that nothing in the Act "shall limit or affect the authority of a State or local government . . . over decisions regarding the placement . . . of personal wireless service facilities." Thus, here there is no comparable public policy being transgressed, indeed no preemption that might motivate the Court to extend a statutory mandate to extinguish private rights.

### Balancing the Equities

■ Similarly, we reject defendants' argument that the restrictive covenants should be extinguished under RPAPL 1951 (2), which provides:

> "When relief against such a restriction is sought in an action to quiet title or to obtain a declaration with respect to enforceability of the restriction . . . if the court shall find that the restriction is of no actual and substantial benefit to the persons seeking its enforcement or seeking a declaration or determination of its enforceability, either because the

purpose of the restriction has already been accomplished or, by reason of changed conditions or other cause, its purpose is not capable of accomplishment, or for any other reason, it may adjudge that the restriction is not enforceable by injunction . . . ."

As we underscored in *Orange & Rockland Util. v Philwold Estates* (52 NY2d 253, 266 [1981]), "the issue is not whether [the party seeking the enforcement of the restriction] obtains *any* benefit from the existence of the restriction but whether in a balancing of equities it can be said to be, in the wording of the statute, 'of *no* actual and *substantial benefit*' " (emphasis in original). Equally clear is that the party claiming that a restriction is unenforceable bears the burden of proving it (*see e.g. Deak v Heathcote Assn.*, 191 AD2d 671, 672 [2d Dept 1993]).

Here, Supreme Court found, and the Appellate Division agreed, that "defendants have failed to meet their burden of proof and no credible evidence has been put forward by defendants that the landowners do not derive any actual and substantial benefit from restricting the land to solely residential use. To the contrary, plaintiffs have shown that the properties have benefitted from such restriction." Given ample support in the record, this affirmed factual finding is beyond the scope of our review.

Nor do defendants' alleged hardships tip the balance of equities in favor of extinguishing plaintiffs' rights. Here too, Supreme Court and the Appellate Division properly balanced the equities. In particular, the courts discounted SMSA's alleged hardship because it proceeded with construction of the facility with knowledge of the restrictive covenants and of plaintiffs' intention to enforce them. Its difficulty was thus "largely self-created" (303 AD2d at 537). As for defendant Stone Hill's argument that it was unable to sell the property for residential use, Supreme Court found that the "[d]efendants have failed to show that the restrictions['] purpose in retaining the residential nature of the area was not capable of being accomplished or that there were any changed conditions that would warrant granting defendants relief from the restrictive covenant." These

affirmed findings, too, are supported by the record and beyond the scope of our review.[1]

Addressing the dissent, for at least three reasons, the Second Circuit's decision in *Sprint Spectrum, L.P. v Willoth* (176 F3d 630 [1999])—the nub of the dissent—is inapposite. First, at issue here is the enforceability of the restrictive covenants, not the "separate and distinct" authority of the Town to grant the permit (*Matter of Friends of Shawangunks v Knowlton*, 64 NY2d 387, 392 [1985]). Second, the TCA's ban applies to "State or local government[s] or instrumentalit[ies]," not individual citizens' efforts to enforce their rights.

Third, *Sprint* involved a conflict between the TCA's ban on prohibiting service by state and local governments on the one hand and a town's rejection of an application on the other. *Sprint* did not implicate private contract rights. Indeed, the Second Circuit made clear that it did "not read the TCA to allow the goals of increased competition and rapid deployment of new technology to trump all other important considerations" (176 F3d at 639). That there are relatively large setbacks, few dwellings and considerable topographic relief in the Stone Hill area (dissenting op at 440)—a consequence of the longstanding bargained-for covenants—is not a reason for now situating a 120-foot monopole, 660-square-foot equipment shed and parking space for maintenance vehicles in the neighborhood. On this record, neither "least intrusive means" nor the Restatement of Property supports such a result.[2] As Supreme Court and the Appellate Division correctly concluded, the TCA does not preempt the power of private citizens to enforce their contractual rights, or limit judicial enforcement of those rights.

Finally, we note that the Town urges that it would need time to relocate the antenna without interruption of service vital to public health and safety. Plaintiffs have consented to "a reasonable time period" for relocation.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

READ, J. (dissenting). The Town Board of the Town of Pound

---

1. Supreme Court additionally rejected defendants' laches argument, finding no credible evidence that plaintiffs unreasonably delayed bringing their action. Neither that argument, nor mootness, was advanced in our Court.

2. *See* Restatement (Third) of Property (Servitudes) § 3.1, Comment *i* ("The policies favoring freedom of contract, freedom to dispose of one's property, and protection of legitimate-expectation interests nearly always weigh in favor of the validity of voluntarily created servitudes.").

Ridge has determined that siting a wireless telecommunications tower at the Stone Hill site provides the least intrusive means to close a significant gap in personal wireless services in the town. Under these circumstances, the restrictive covenant limiting development on the Stone Hill site to a single-family residence must yield to public policy as expressed in the Telecommunications Act of 1996 (TCA), codified at 47 USC § 151 *et seq.* For this reason, I respectfully dissent, and would reverse the order of the Appellate Division.

I view this case from the essential standpoint of section 332 of the TCA (47 USC § 332). The relevant language of this provision makes it unlawful for state or local authorities to regulate the placement, construction or modification of personal wireless service facilities in such a way as to "prohibit or *have the effect of prohibiting* the provision of personal wireless services" (47 USC § 332 [c] [7] [B] [i] [II] [emphasis added]). In considering whether to grant New York SMSA Limited Partnership, doing business as Verizon Wireless, (SMSA) a special permit for the Stone Hill site or for the Highway Garage/DPW site alone or in combination with another site, the Town Board and the Town Planning Board were properly guided (in fact, constrained) by the interpretation given to the TCA's antiprohibition ban by the United States Court of Appeals for the Second Circuit in *Sprint Spectrum, L.P. v Willoth* (176 F3d 630 [2d Cir 1999]).[1]

In that case, Sprint filed three separate applications with the Planning Board for the Town of Ontario, New York, asking for site plan approval to construct three separate cell sites, each accommodating a 150-foot tall monopole tower. During a 17-month review period punctuated by public hearings and the submission and consideration of draft and final environmental impact statements, Sprint consistently resisted entertaining alternatives with respect to the number, height and placement of towers. Confronted with a choice between three towers or none, the Ontario Planning Board denied all three applications on environmental grounds. Sprint sued, asserting federal and state claims, lost in the District Court and appealed.

Sprint claimed a right by virtue of the antiprohibition clause to construct as many towers as were, in its business judgment,

---

1. There is no question that the local authorities were aware of and conducted their review of SMSA's applications so as to conform with *Sprint*: when making its recommendations to the Town Board concerning SMSA's application for a special permit for the Stone Hill site, the Planning Board cited *Sprint* and quoted its operative language when explaining the Town's obligations under the TCA.

necessary for its effective competition with other telecommunications carriers, wireless or not. The Town interpreted the clause as prohibiting only general bans, never individual decisions on specific applications. In an opinion by Circuit Judge (currently, Chief Judge) Walker, the Second Circuit rejected both "extreme positions" (*Sprint*, 176 F3d at 641) as obviating the meaning of many of the TCA's other provisions and as inconsistent with the statute's public policy goals: to promote the rapid deployment of new technology and foster competition and innovation in the telecommunications marketplace while at the same time preserving local land use control, subject to certain limitations.

Commenting that "[i]t would be [a] gross understatement to say that the [TCA] is not a model of clarity" (*Sprint*, 176 F3d at 641, quoting *AT & T Corp. v Iowa Util. Bd.*, 525 US 366, 397 [1999]), Judge Walker next engaged in a "detailed parsing of the statutory language, including layers of highly technical definitions" (*Sprint*, 176 F3d at 641). At the end of this exegesis, he concluded that the antiprohibition clause prevents localities from regulating personal wireless service facilities in such a way as to preclude users in a remote location from connecting to the national telephone network. "In other words, local governments must allow service providers to fill gaps in the ability of wireless telephones to have access to land-lines" (*id.* at 643).

In view of the foregoing, the Second Circuit held in *Sprint* that "the [TCA]'s ban on prohibiting personal wireless services precludes denying an application for a facility that is the *least intrusive means for closing a significant gap* in a remote user's ability to reach a cell site that provides access to land-lines" (*id.* [emphasis added]).[2] Applying this holding to the facts, the Court determined that Sprint's applications were not for the least

---

2. *Sprint* is a leading case nationally, although its holding is not universally accepted. The Third Circuit shares the Second Circuit's interpretation of the antiprohibition clause (*see APT Pittsburgh Ltd. Partnership v Penn Twp. Butler County of Pa.*, 196 F3d 469, 480 [3d Cir 1999] [The provider must show "that the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve." In order to make this showing, the provider must demonstrate that "a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc."]). The Fourth Circuit has declined to adopt the Second and Third Circuits' interpretation, although it now seems to accept, at least in theory, that an individual zoning decision is capable of violating the antiprohibition ban (*compare 360° Communications Co. of Charlottesville v Board of Supervi-*

intrusive facilities and therefore the Town's denial of them did not violate the TCA.

Under the Second Circuit's holding in *Sprint*, a provider must therefore make two showings in order to demonstrate that a permit denial prohibits or effectively prohibits service within the meaning of the TCA: that there is a significant gap in service coverage that the application seeks to fill, and that the application implements the least intrusive means necessary to fill the gap and provide the service. Put in another way, when a provider makes these showings, the TCA requires the locality to issue any necessary permits; a locality that nonetheless denies the necessary permits thereby effectively prohibits the provision of personal wireless services in violation of section 332 of the TCA.

In this case, it is undisputed that there was a significant gap in wireless coverage needing to be closed when SMSA filed its application. Further, the record fully supports the Town Board's conclusion that siting a tower at the Stone Hill site represented the least intrusive means for closing this significant gap.

Specifically, in January 1999, SMSA applied for a special permit under the Town's local law entitled "Wireless Telecommunications Services Facilities," which amended the zoning law to establish special standards and requirements for such uses, subject to special permit approval. The Town Board subsequently requested additional information, held a public hearing

---

*sors of Albemarle County*, 211 F3d 79, 86, 87 [4th Cir 2000] [noting that "whether a single denial of a site permit could ever amount in effect to the prohibition of wireless services is a . . . difficult question" and expressing the view that "(a) community could rationally reject the least intrusive proposal in favor of a more intrusive proposal that provides better service or that better promotes commercial goals of the community"] *with AT & T Wireless PCS, Inc. v City Council of City of Va. Beach*, 155 F3d 423 [4th Cir 1998] [the antiprohibition ban applies only to blanket prohibitions and general bans or policies, and not to individual zoning decisions]). The Seventh Circuit has declined to adopt the Second and Third Circuits' least-intrusive-means formulation (*see VoiceStream Minneapolis, Inc. v St. Croix County*, 342 F3d 818, 834 [7th Cir 2003] ["(T)he provider must show that its 'existing application is the only feasible plan' and that 'there are no other potential solutions to the purported problem'" (quoting *Second Generation Props., L.P. v Town of Pelham*, 313 F3d 620, 630, 635 [1st Cir 2002])]). The Seventh Circuit "agree[s] with the First Circuit's formulation of the statutory requirement and hold[s] that, so long as the service provider has not investigated thoroughly the possibility of other viable alternatives, the denial of an individual permit does not 'prohibit or have the effect of prohibiting the provision of personal wireless services'" (*VoiceStream*, 342 F3d at 834-835, quoting 47 USC § 332 [c] [7] [B] [i] [II]).

and, in April 1999, forwarded SMSA's application to the Town Planning Board, as required by the zoning law.

The Town Planning Board discussed the application at numerous meetings, solicited additional information from SMSA and engaged special counsel as well as technical consultants to assist in its review. As part of that review, the Planning Board studied alternative sites.

In November 1999, the Town Planning Board issued an "Advisory Review and Recommendation." At the outset, the Board noted that siting a wireless communications facility in Pound Ridge, while necessary, was made particularly difficult by certain "givens": "Pound Ridge is overwhelmingly residential, topographically varied, and relatively rural in character"; and "[m]uch of the Town's minimal commercial area, normally more compatible for [wireless telecommunications services facility] locations, is either low in elevation or within 2500 feet of an historic district, both of which make siting problematic."

In light of these factors, the Board made findings as follows:

> "In its effort to identify *the least intrusive means of closing the existing gap in wireless service*, the [Planning] Board evaluated not only [the Stone Hill site] as proposed and as modified through the proceedings, but also a number (18) of alternative sites, eventually narrowed down to eight" (emphasis added).

Further, "[o]n balance, the [Stone Hill site], having been given more thorough consideration by [SMSA], seems to meet many of the Town's criteria, except in one glaring area—residential location on a residential lot" (emphasis in original). Based on its evaluation of alternatives, the Planning Board recommended a preferred ranking of the DPW/Highway Garage site alone; followed by the DPW/Highway Garage site in combination with another site; and, finally, the Stone Hill site, "but only with all of the [Planning Board's] suggested mitigation."

Based on the Town Planning Board's findings and recommendations, the Town Board amended its site inventory list and received and reviewed an application from SMSA for a special permit for the DPW/Highway Garage site. SMSA thus made two special permit applications—one for the Stone Hill site; one for the DPW/Highway Garage site—with the understanding that only one application would be approved and that the other would be withdrawn as a condition of this approval. The Board

then undertook a detailed review of SMSA's application for the DPW/Highway Garage site, just as it had already done for the Stone Hill site. At the end of this review, the Board held a joint public hearing on the applications for both sites.

In April 2000, the Town Board adopted a resolution, including a negative declaration under the State Environmental Quality Review Act, with respect to the Stone Hill site.[3] The Board identified the Stone Hill site as "the technologically best available site" in the town in terms of coverage, and therefore as the site with the "best chance of being the only site necessary to meet the needs and demands for [the town's] wireless telecommunication services." The Board also noted that most of the tower would not be directly visible from adjoining residences; and that the Stone Hill site "enjoys relatively large setbacks and few neighbors and is also separated from residences on adjoining lots by considerable topographic relief." Indeed, the Stone Hill site was the potential site with the *fewest* existing dwellings within a 1,000-foot radius. The Stone Hill site's only disadvantage was that "with the exception of the primary electric distribution lines which cross [it] within a 100 foot wide utility easement, the property is a vacant residential parcel in a residential area." Finally, the Board required SMSA to undertake numerous mitigation steps as a condition of the special permit, including landscaping and other aesthetic measures. The tower and its nearby equipment building, disguised as a barn, occupy roughly 2,000 square feet on 9.5 acres of land

---

**3.** The majority stresses that the Stone Hill site was, in fact, "taken off" the Town Board's "agenda" during the review process only to be "placed back on the agenda" shortly before the Board issued the special permit (majority op at 430). Plaintiffs did not mention the restrictive covenant until the very end of the Board's tandem review of SMSA's two applications. When plaintiffs sued, defendants accordingly asserted laches as a defense. To counter this defense, plaintiffs protested that they had "believed" that the Stone Hill site "was no longer being considered" and "therefore . . . felt no need to take any action" any sooner than they did; and that the DPW/Highway Garage site was "the only application outstanding" or "on the table" as late as February 2000. The record belies these "beliefs," insofar as they may be interpreted to suggest that the Board resurrected the Stone Hill site at the eleventh hour after having previously abjured any continuing interest in it. The Stone Hill site may have dropped off the Board's "agenda" between November 1999 and February 2000, but only in the sense that the Board was reviewing SMSA's application for the DPW/Highway Garage site during this time period, having already reviewed SMSA's application for the Stone Hill site.

otherwise undeveloped except for the primary electric distribution lines and telephone poles.[4]

In short, SMSA, unlike Sprint, did not resist alternative sites or mitigation measures put forward by the local authorities, and, in fact, went so far as to apply for a special permit for a suggested alternative site. The Stone Hill site—the best site technologically; the site with the fewest residential neighbors; the only site with the potential to function as a sole site—represented the least intrusive means to close the acknowledged significant gap in the town's personal wireless services. The Board's denial of the special permit, under these circumstances, would have effectively prohibited the provision of personal wireless services within the meaning of section 332 of the TCA, as interpreted by the Second Circuit in *Sprint*. A restrictive covenant—a private contract—cannot thwart a land use that federal law carrying out national telecommunications policy requires local authorities to approve.

In *Crane Neck Assn. v New York City/Long Is. County Servs. Group* (61 NY2d 154, 166 [1984]), we addressed a restrictive covenant the enforcement of which would have "frustrated" a state policy encouraging placement of the mentally disabled in the community. We focused on Mental Hygiene Law § 41.34 (f), which deems a community residence a "family unit[ ] for the purposes of local laws and ordinances." This provision was prompted by resistance to the siting of group homes in the form of injunctive actions based upon local ordinances limiting the use of property to single-family residences. In light of the State's purpose in enacting the statute and because "[p]rivate covenants . . . pose the same deterrent to the effective implementation of the State policy as the local laws and ordinances that had actually been the subject of . . . legal challenges" (*id.* at 164), we concluded that the covenant could not be equitably enforced as a matter of public policy.

Similarly, the proliferation of cell towers has prompted resistance and legal challenges on the grounds of unsightliness, perceived health risks and decreased property values. Indeed, respondents in this case have, at one time or another, opposed placement of the tower on the Stone Hill site for each of these

4. The original Stone Hill site is a 4.5-acre parcel. Access to the tower and equipment shed is over an adjacent five-acre parcel, owned by the same landowner. In approving the special permit, the Town Board directed SMSA and the landowner to record a restrictive covenant limiting the adjacent parcel's use to open space and passive recreation.

reasons. As the Second Circuit recognized in *Sprint*, while not allowing "the goals of increased competition and rapid deployment of new technology to trump all other important considerations, including the preservation of the autonomy of states and municipalities" (*Sprint*, 176 F3d at 639), the Congress in the TCA chose to compromise and accommodate competing aims. Specifically, Congress preserved local control over the placement, construction and modification of personal wireless service facilities, but subject to important limitations intended to make sure that rational siting decisions were not checked or delayed by local zoning regulation or litigation. These limitations include the antiprohibition ban. The majority suggests that *Crane Neck* is inapposite because Mental Hygiene Law § 41.34 (f) "explicitly preempted local laws and ordinances, defining a community residence . . . as a family unit" (majority op at 433) while the TCA preserves local land use control. Congress, however, expressly and completely preempted local land use regulation insofar as it prohibits or effectively prohibits the provision of personal wireless service facilities. As was the case in *Crane Neck*, private individuals are here attempting to accomplish by restrictive covenant that which a statute (in this case, a federal statute implementing our national telecommunications policy) unequivocally forbids a locality from doing in the exercise of its police powers to regulate local land use.

Of course, as I noted at the outset, the majority and I disagree as to whether enforcement of the covenant would effectively prohibit delivery of wireless services in the town within the meaning of section 332 of the TCA. The majority does not consider the antiprohibition ban implicated here because alternative locations for siting the tower exist, even though no single site can replace the Stone Hill site, and any other potential site (18 sites were reviewed originally; one alternative site—the DPW/Highway Garage site—was reviewed intensively) is less optimal technologically, less secluded and otherwise less beneficially suited to the use. This reading of section 332 verges on limiting it to general bans. In any event, the majority's interpretation plainly conflicts with *Sprint*.

Finally, unlike the majority, I find merit in SMSA's related argument that enforcement of the covenant would impermissibly nullify the Town's ability to regulate local land use. The Town Board thoroughly examined and balanced the interests and concerns of the affected property owners with those of the entire town before issuing the special permit to SMSA. When

respondent challenged the permit in an article 78 proceeding, Supreme Court held in the Town's favor. While as a general rule restrictive covenants and zoning comfortably coexist and zoning does not destroy a preexisting private covenant (*see generally Matter of Friends of Shawangunks v Knowlton*, 64 NY2d 387 [1985]), this case is unusual. The covenant directly conflicts with a special permit issued to provide a public utility in a way that takes into account the best interests of the community as a whole and furthers national telecommunications policy. As a consequence of this covenant's enforcement, multiple (and more intrusive) towers will now have to be sited in order to replace the Stone Hill site and serve the community's needs for personal wireless services. In line with the approach advanced in the Restatement (Third) of Property (Servitudes), which considers public policy, broadly defined, as an independent basis for invalidating servitudes, I would hold that this restrictive covenant violates public policy and so is invalid and therefore unenforceable (*see* Restatement [Third] of Property [Servitudes] § 3.1, Comments *e, f*; *see also* Restatement [First] of Property [Servitudes] § 568, Comment *d*).

Accordingly, I would reverse the order of the Appellate Division.

Judges G.B. SMITH, CIPARICK, ROSENBLATT, GRAFFEO and R.S. SMITH concur with Chief Judge KAYE; Judge READ dissents and votes to reverse in a separate opinion.

Order affirmed, with costs.