OPINION OF THE COURT
Alan D. Scheinkman, J.
Plaintiffs Rose Kaung, Bill Kaung, Robert Marshall, Carlos Caceres, Stephen Drago, Martha Yeager, Bonnie Ackerman and the Biltmore Towers Owners Coalition (plaintiffs) move for a preliminary injunction enjoining the construction of wireless communication antennas (cell towers) on the roof of a residential building located at 30 Lake Street, White Plains, New York, known as the “Biltmore Towers” (hereinafter the condominium or the premises), by defendant MetroPCS New York, LLC (Metro)[1] during the pendency of this action (sequence No. 1). Plaintiffs also move for partial summary judgment on their first cause of action for rescission[2] and/or their seventh cause of action for a permanent injunction (sequence No. 2).[3]
Defendant Metro opposes plaintiffs’ motions and cross-moves for summary judgment dismissing plaintiffs’ second, third, fourth and seventh causes of action (sequence No. 3). Defendant Board of Managers of the Biltmore Towers Condominium Association (the Board), and individual defendants William Palmer, Jr., Henriette Brooks, Scott Keenan, Barbara McCullough, Edward Rodriguez, Carolyn Roberts and Elizabeth Thompson (collectively the Board defendants) also oppose plaintiffs’ motion and cross-move for summary judgment (sequence No. 4) for an order: (1) declaring that the Board had the authority to enter into the lease with Metro; (2) declaring that the individual Board members are not individually liable; (3) dismissing *856 plaintiffs’ claim of fraud; (4) dismissing plaintiffs’ request for the removal of Board members because plaintiffs failed to avail themselves of the procedures for such removal; and (5) dismissing Steven Drago and the Biltmore Towers Owners Coalition (Owners Coalition) for lack of standing.[4]
Factual and Procedural History
This lawsuit is a classic case of NIMBY — “Not in My Backyard.” It is hardly uncommon for a proposed improvement that could benefit the public generally to be opposed by those in the neighborhood in which it is to be located. Indeed, the passion with which it is asserted that there is a public good to be served is sometimes directly proportionate to the distance between the proponent and location to be burdened. This case is more precisely a case of NOME — “Not on My Roof.” A quest for upgraded wireless communications in the City of White Plains is pitted against the concerns of condominium owners that the placement of cell towers on the roof of their condominium will cause ill health effects. While the use of cell phones is ubiquitous, and users are frustrated when their calls are dropped, relatively few users are all that interested in having a cell tower built on their property, or even nearby.
This action challenges a 25-year lease agreement entered between the Board and Metro on or about December 20, 2007 (eff Dec. 8, 2008)[5] allowing Metro to erect and maintain eight cell towers on the roof of the subject building (the agreement) (exhibit G to Marshall off). The challengers are unit owners[6] in the 12-story, 131-unit Biltmore Towers Condominium.
On August 4, 2008, plaintiffs moved to prevent Metro from proceeding with the construction of the cell towers. On that date, after hearing from both sides, the court granted a temporary restraining order and, on August 22, 2008, continued that restraint pending determination of the preliminary injunc *857 tian motion (see affirmation of Joshua E. Kimerling, Esq., exhibits C, F). Because the court perceived the decisive question to be one of law, the court invited the parties to move for summary judgment, which they have.
Plaintiffs contend that, based on provisions found in the offering plan, declaration and bylaws (the governing documents), the Board was without authority to enter into the agreement without the approval of a majority of the unit owners.[7] Plaintiffs argue that the agreement involves a commercial use of the roof and thus violates the governing documents which maintain the residential character of the condominium (except for one unit that was designated for office use). Not only do the bylaws limit the units’ use to residential uses, the governing documents provide that “the common elements shall be used only for the furnishing of services and facilities for which they are reasonably intended and which are incident to the use and occupancy of units” (offering plan 1Í 17 [b]; bylaws, art V, § 12 [b]).
Plaintiffs cite to various studies which they contend show the substantial health hazards posed by cellular towers to support their claim of irreparable injury and that the equities weigh in their favor (see Marshall off, exhibits H-N). Plaintiffs also raise issues concerning actions taken subsequent to the entering into of the agreement.[8]
In opposition, Metro asserts that, in connection with its federal license to provide advanced wireless services to the public in the greater New York area (which includes the City of White Plains), it has invested millions of dollars and has plans to construct 10 rooftop wireless sites within the City of White Plains (see affidavit of John Kossitch, sworn to Aug. 20, 2008, [Kossitch off] If 2). Metro contends that the premises’ site is essential to providing the services Metro is obligated to provide *858 and that it may “be the only viable location for MetroPCS’ rooftop site as required to provide services to the public in this area of the City” (Kossitch off 1i 3; see also affidavit of Greg Sharpe, sworn to Feb. 6, 2008; Kossitch off, exhibit A). Metro states that it “attempted but was unable to locate a site classified in a nonresidential zoning district” (see letter from Vincent Xavier, HPC Development LLC, to Daniel Laub, Esq. [Cuddy & Fedder], dated May 12, 2008; Kossitch off, exhibit 4). Further, Metro argues there will be no negative aesthetic impact as a result of the agreement since the construction will consist of “small panel antennas . . . [being] mounted to the existing roof and other equipment installed in rooftop common areas of the building” (id. 1Í 3).
Metro submits a report from its expert which states that the proposed cell towers would comply with Federal Communications Commission regulations. The report concludes “[e]yen with the significant degree of conservatism incorporated in the calculations, the worst-case calculated result is still more than 280 times below the limit established as safe for continuous human exposure to RF emissions from antennas” (see Report of Pinnacle Telecom Group, dated Jan. 28, 2008, at 4, exhibit C to affirmation of Christopher B. Fisher, Esq., dated Aug. 20, 2008). Metro claims that it would be irreparably injured if it is not allowed to proceed with the installation of the cell towers (which, according to Metro, could be readily removed at a later date by order of this court). This is because, given the time it took to obtain zoning approvals and permits and to obtain the agreement, Metro “would be unable to timely redesign the network and find, lease, zone and construct any alternative site(s)” in time for its intended launch in the first half of 2009 (id. 1i 5).
Metro also submits an affirmation from its counsel which attaches: (1) the minutes from the Board meeting held on December 6, 2007 at which the Board resolved that the proposed rooftop wireless facility was not an addition, alteration or improvement as defined in the bylaws so that the agreement could be entered into without the unit owners’ consent; (2) various correspondence from plaintiffs and their counsel to show that the equities do not weigh in plaintiffs’ favor given their delay from March 2008 to August 2008 in seeking injunctive relief; and (3) the bylaws and oral argument transcript from Di Fabio v Omnipoint Communications, Inc. (NYLJ, Feb. 7, 2008, *859 at 32, col 1 [Sup Ct, Westchester County, Donovan, J.]), offered in support of Metro’s claim that Di Fabio is on “all fours” with the present case.[9]
On the issue of the Board’s authority to enter into the agreement, Metro argues that the “most specific” provision of the bylaws regarding the use of the common elements does not limit their use to residential purposes only, but instead states that they “shall be used only for those purposes for which they are reasonably suited and capable” (Metro mem of law at 3, quoting bylaws, art V, § 15). In terms of contract construction, Metro argues that since it is the more specific provision, it should control. And Metro maintains that given its language, there can be no argument “that the roof is [not] ‘reasonably suited and capable’ of being used exactly as proposed pursuant to the MetroPCS Lease Agreement” (id. at 3-4). Furthermore, Metro argues that a construction of the bylaws at issue to include a provision mandating that the common elements be used only for residential purposes would render this section of the bylaws superfluous. Thus, according to Metro, the only issue for this court to determine is whether “wireless services are ‘incident to’ residential uses of units” (id. at 4). In answering the question posed, Metro responds by stating that they are as incidental to the residential use of the units as are land lines, cable services, and Internet services,[10] and the fact that the wireless services would be used by people other than the residents is not dispositive since “there is no exclusivity limitation in any of the relevant provisions of the Governing Documents related to the general use of the common elements, such *860 as the roof’ (id. at 5).[11] Metro also sets forth its interpretation of the meaning of “incident to” as “a minor use that is subordinate to, but not necessarily the same as, the principal use, i.e., use as a residence” (id. at 9). And Metro points to prior precedent for placing equipment on the condominium’s roof for use by nonresidents (i.e., the satellite radio receiving facility the Board agreed to have placed on the roof) (id. at 6).[12] This prior course of dealing, Metro argues, should be determinative of the meaning to be ascribed to the provisions of the bylaws because under the doctrine of practical construction, the parties’ conduct is the best evidence of the correct interpretation of the reasonable expectations of the parties (id. at 14). Accordingly, Metro requests that the court grant it summary judgment dismissing the second and fourth through seventh causes of action. Finally, Metro requests that the court dismiss the conspiracy to commit a tort (third cause of action) on the grounds that New York does not recognize such a cause of action (id. at 17).
The Board members separately oppose plaintiffs’ motions and cross-move for summary judgment. According to the Board defendants, the plaintiffs’ opposition is “based on their subjective belief that cellular antennas pose a health risk, a belief which is completely unsupported by accepted scientific evidence” (affirmation of Kimberly Connick, Esq., dated Oct. 2, 2008,1i 10). The Board defendants also submit an affidavit from William Palmer, president of the Board, sworn to August 20, 2008 (Palmer afi). Palmer avers that based on his 11 years of experience on the Board, the Board was within its rights to enter into the agreement since the Board has previously entered into leases involving the common elements of the premises which generate revenue (i.e., leases for the washers and dryers, the agreement with XM Satellite Radio for antennas to be placed on the roof, and its agreement with Verizon FIOS for equipment to be installed in common areas) (Palmer off HIT 3-5). He also attests that the Board members will not receive any direct benefit from the agreement, other than the benefit they will receive along with all other unit owners when the funds received from Metro are used to offset future operating costs (id. HH 9-10).
The Board defendants argue that the Board had the authority to enter into the agreement and its action is governed by the *861 business judgment rule. Because the Board is empowered to administer the affairs of the condominium, including the management and control of the common elements, it was within the Board’s province to determine, pursuant to bylaws, article y section 12 (a) and (b), whether the placement of the cellular towers was “reasonably suited and . . . incident to the use and occupancy of units” (Board defendants’ mem of law at 4). According to the Board defendants, the cellular antennas were reasonably suited for placement on the roof since the roof currently houses similar items (e.g., air conditioner towers, roof antenna, elevator equipment room, roof fans), is not used for any residential purposes (e.g., no gardens, decks or walking areas), and the residents are not even permitted on the roof {id. at 4-5). The Board defendants go so far as to argue that the condominium’s house rule 7 specifically addresses the authority of the Board to approve the placement of the cellular towers on the roof since it provides: “No . . . radio or television aerial shall be attached or hung from the exterior of the Building . . . except as shall have been approved in writing by the Board of Managers or the managing agent or the manager, which approval shall not be unreasonably withheld” (Board defendants’ mem of law at 5 n 1). To support their decision that the agreement would be incident to the residential use of the buildings, the Board defendants maintain that because there would be in excess of $270,000 in revenues generated by the agreement during its initial term, which funds would be used to reduce each unit owner’s obligation to pay for the maintenance of the common elements (e.g., reduce the common charges), the agreement should be “deemed to be incident to the use and occupancy of the building” {id. at 5-6).
To counter plaintiffs’ claims of health hazards caused by cell towers, the Board defendants argue that the studies attached to plaintiffs’ moving papers are inadmissible “junk science” under the holding of Frye v United States (293 F 1013 [DC Cir 1923]), since they are not based on scientific principles, procedures or theories that have gained general acceptance in the relevant scientific field. Further, the Board defendants argue that plaintiffs’ assertions of negative health effects are preempted by federal law which provides that “[n]o State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commis *862 sian’s regulations concerning such emissions” (Board defendants’ mem of law in opposition to preliminary injunction motion at 13, quoting 47 USC § 332 [c] [7] [B] [iv]).
With regard to the individual liability of the Board members, the Board defendants argue that the complaint is devoid of any factual allegations that they acted in their individual capacities and, therefore, the business judgment rule protects the Board members from individual liability if they acted in a manner reasonably related to the exercise of their duty. Accordingly, as the complaint does not allege that the individual defendants “were ever acting outside the scope of their authority, that their actions did not legitimately further the corporate purpose, or that they acted in bad faith” {id. at 11), the complaint against the individual defendants should be dismissed. The Board defendants further argue that plaintiffs’ claim in their moving papers that they acted in bad faith is without merit and cannot sustain plaintiffs’ claims against the individual defendants since (1) bad faith is not alleged in the complaint, and (2) in any event, it is without merit, since bad faith requires a showing that the plaintiff was singled out for unfair treatment. And there is no basis to pierce the corporate veil because there are no allegations that the individual defendants abused the corporate form.
The Board defendants also seek dismissal of plaintiffs’ claim or allegations of fraud based on their failure to plead fraud with the requisite particularity (CPLR 3016). And they seek dismissal of the plaintiffs’ request that the individual defendants be removed as members of the Board on the grounds that plaintiffs have not availed themselves of the procedure set forth in the condominium’s bylaws to remove Board members by a vote of the majority of the unit owners (Board defendants’ mem of law in opposition to preliminary injunction motion at 17), nor have they shown the efforts they made to secure such a result or that the demand would be futile.
Plaintiffs reply that: (1) because the governing documents were created in 1977, long before the advent of cellular communications, defendants may not rely on the fact that the erection of cellular towers was not expressly precluded by the governing documents; (2) the impact of the agreement is much more far-reaching than what defendants portray (i.e., a few antennas being placed on the roof) because the agreement allows the installation of equipment throughout the premises and further, Metro is given unfettered access (without escorts) to the premises 24/7 to make repairs, etc.; and (3) Di Fabio is distinguishable.
*863 The Board’s Authority to Enter into the Agreement
Matter of Levandusky v One Fifth Ave. Apt. Corp. (75 NY2d 530, 539-540 [1990]) addresses the standard of review to be applied to decisions made by cooperative boards[13] which seeks to minimize judicial interference with decisions arising out of common ownership[14] found in condominium and cooperative living arrangements:
“As this case exemplifies, board decisions concerning what residents may or may not do with their living space may be highly charged and emotional. A . . . condominium is by nature a myriad of often competing views regarding personal living space, and decisions taken to benefit the collective interest may be unpalatable to one resident or another, creating the prospect that board decisions will be subjected to undue court involvement and judicial second-guessing. Allowing an owner who is simply dissatisfied with particular board action a second opportunity to reopen the matter completely before a court, which — generally without knowing the property — may or may not agree with the reasonableness of the board’s determination, threatens the stability of the common living arrangement” (Matter of Levandusky, 75 NY2d at 539-540).
Balancing these competing interests, the court ruled:
“So long as the board acts for the purposes of the [condominium], within the scope of its authority and in good faith, courts will not substitute their judgment for the board’s. Stated somewhat differently, unless a resident challenging the board’s action is *864 able to demonstrate a breach of this duty, judicial review is not available” (id. at 538 [emphasis added]).
However, a court may review “improper decisions, as when the challenger demonstrates that the board’s action has no legitimate relationship to the welfare of the [development], deliberately singles out individuals for harmful treatment, is taken without notice or consideration of the relevant facts, or is beyond the scope of the board’s authority” (id. at 540). Thus, “[b]efore reviewing a condominium board’s exercise of any power under the business judgment standard . . . the court must first make a determination as to whether the board in fact possessed the power it purported to exercise” (Blumberg v Albicocco, 12 MisC 3d 1045, 1048 [Sup Ct, Nassau County 2006]). And “the power claimed by the board must either be granted by statute or derived from the declaration or bylaws of the condominium” (id.).
Consequently, the central issue is whether the Board had the authority to enter into the agreement. This issue, as discussed below, is a question of law properly resolvable on summary judgment.
The Summary Judgment Standard
The proponent of a motion for summary judgment carries the initial burden of production of evidence as well as the burden of persuasion (Alvarez v Prospect Hosp., 68 NY2d 320 [1986]). The moving party must tender sufficient evidence to demonstrate as a matter of law the absence of a material issue of fact.[15] Failure to make that initial showing requires denial of the motion, regardless of the sufficiency of the opposing papers (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]; St. Luke’s-Roosevelt Hosp. v American Tr. Ins. Co., 274 AD2d 511 [2d Dept 2000]; Greenberg v Manlon Realty, 43 AD2d 968 [2d Dept 1974]). Once the moving party has made a prima facie showing to entitlement to summary judgment, the burden of production shifts to the opponent, who must now go forward and produce sufficient evidence in admissible form to establish the existence of a triable issue of fact or demonstrate an acceptable excuse for failing to do so (Zuckerman v City of New York, 49 NY2d 557, 562 [1980]; Tillem v Cablevision Sys. Corp., 38 AD3d 878 [2d Dept 2007]; Fleming v Graham, 34 AD3d 525 [2d Dept 2006]).
*865 The court’s main function on a motion for summary judgment is issue finding rather than issue determination (Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395 [1957]). Since summary judgment is a drastic remedy, it should not be granted where there is any doubt as to the existence of a triable issue (Rotuba Extruders v Ceppos, 46 NY2d 223 [1978]). Thus, when the existence of an issue of fact is even arguable or debatable, summary judgment should be denied (Stone v Goodson, 8 NY2d 8 [I960]; Sillman v Twentieth Century-Fox Film Corp., supra). In reviewing a motion for summary judgment, the court must accept as true the evidence presented by the nonmoving party and must deny the motion if there is “even arguably any doubt as to the existence of a triable issue” (Baker v Briarcliff School Dist., 205 AD2d 652, 653 [2d Dept 1994]).
Here, the bylaws have the force and effect of a contract between the unit owners and the Board (see Stony Brook Shores Prop. Owners Assn, v Liscia, 169 AD2d 712 [2d Dept 1991]; Lesal Assoc, v Board of Mgrs. of Downing Ct. Condominium, 309 AD2d 594 [1st Dept 2003]; Mishkin v 155 Condominium, 2 Misc 3d 1001 [A], 2004 NY Slip Op 50066[U] [Sup Ct, NY County 2004]). Thus, the provisions of the bylaws control whether the Board had the authority to enter into the agreement.
The threshold inquiry in a motion for summary judgment involving a contract dispute is whether the contract is free from ambiguity such that its provisions may be enforced without resort to extrinsic evidence. The interpretation of an unambiguous contract is a question of law for the court (Kass v Kass, 91 NY2d 554, 566 [1998]; Taussig v Clipper Group, L.P., 13 AD3d 166, 167 [2004], lv denied 4 NY3d 707 [2005]; 1550 Fifth Ave. Bay Shore v 1550 Fifth Ave., 297 AD2d 781, 783 [2002], lv denied 99 NY2d 505 [2003]).
“In interpreting a contract, the intent of the parties governs ... A contract should be construed so as to give full meaning and effect to all of its provisions
“Where the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law and the case is ripe for summary judgment . . . On the other hand, if it is necessary to refer to extrinsic facts, which may be in conflict, to determine the intent of the parties, there is a question of fact, and summary judgment should be denied” (American Express Bank v Uniroyal, Inc., *866 164 AD2d 275, 277 [1990], Iv denied 77 NY2d 807 [1991]).
“Where consideration of a contract as a whole resolves an ambiguity created by one clause, there is no occasion to consider extrinsic evidence of the parties’ intent” (Hudson-Port Ewen Assoc, v Chien Kuo, 78 NY2d 944, 945 [1991]).
“[T]he aim is a practical interpretation of the expressions of the parties to the end that there be a ‘realization of [their] reasonable expectations’ ” (Brown Bros. Elec. Contrs. v Beam Constr. Corp., 41 NY2d 397, 400 [1977]; see also South Rd. Assoc, v International Bus. Machs. Corp., 2 AD3d 829, 833 [2003] [“(t)he language of a contract must be interpreted ‘to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized’ ”], affd 4 NY3d 272 [2005]). Thus, “[t]he rules of construction of contracts require [the court] to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect” (Muzak Corp. v Hotel Taft Corp., 1 NY2d 42, 46 [1956]; see also Matter of Columbus Park Corp. v Department of Hous. Presero. & Dev. of City of N.Y., 80 NY2d 19, 31 [1992]; Two Guys from Harrison-N.Y.v S.ER. Realty Assoc., 63 NY2d 396, 403 [1984]).
Construction of the Governing Documents
Under the governing documents, unit owners elect members of the Board of Managers who are empowered to supervise the property and manage the affairs of the condominium (bylaws, art II, § 1). The Board’s powers include (1) the operation, care, upkeep and maintenance of the common elements (e.g., the roof), (2) the determination of the common expenses necessary for the operation and maintenance of the premises, and (3) the adoption and amendment of the rules and regulations covering the details of the operation; however, the rules and regulations must comply with the provisions of the bylaws and unit owners may vote to rescind them (see bylaws, art II, § 2; art V § 12 [fl; offering plan 1i 17 [f]).
The court does not agree with the Board defendants’ claim that the Board was empowered to enter into the agreement by house rule 7. That rule states that no awning or radio or television aerial may be attached to or hung from the exterior of the *867 building.[16] The rule regulates the behavior of unit owners or residents by preventing the marring of the exterior appearance of the building by a plethora of aerials protruding from the residents’ windows.
The bylaws state that they apply “to the Property (defined to include the units and the common elements) of the condominium and to the use and occupancy thereof’ (bylaws, art I, § 2). And “[a]ll present and future owners ... of units . . . and any other persons who may use the facilites of the Property in any manner are subject to these By-Laws” (id. § 3). In this regard, the bylaws limit the uses to which the units and the common elements may be put. Article V, § 12 of the bylaws provides:
“Restrictions on Use of Units. In order to provide for congenial occupancy of the Property and for the protection of the values of the units the use of Property shall be restricted to and shall be in accordance with the following provisions:
“(a) The units shall be used by unit owners ... for residences only ....
“(b) The common elements shall be used only for the furnishing of the services and facilities for which they are reasonably suited and which are incident to the use and occupancy of the units . . . .” (Bylaws, art V, § 12 [a], [b]; see also offering plan 1Í17 [a].)
The declaration provides that “the Building shall be used solely for the purposes for which the units contained therein may be used” (declaration § 7). Another provision of the bylaws states “[t]he common elements and facilities shall be used only for those purposes for which they are reasonably suited and capable” (bylaws, art V § 15 [b]). The declaration and bylaws may only be amended by the approval of at least 66[2]/s% in number and in common interest of all unit owners (bylaws art XI; declaration § 16).
New York’s Condominium Act (Real Property Law §§ 339-d— 339-kk) does nothing to expand the Board’s powers as it provides that the operation of the condominium property “shall be governed by by-laws ... No modification of or amendment to the by-laws shall be valid unless set forth in an amendment *868 to the declaration and such amendment is duly recorded” (Real Property Law § 339-u). The bylaws may be amended upon a vote of 66[2]/s% in number and common interest of the unit owners (Real Property Law § 339-v [1] Q]). Finally, the bylaws may impose such restrictions on and requirements respecting the use of units “as are designed to prevent unreasonable interference with the use of their respective units and of the common elements by the several unit owners” (Real Property Law § 339-v [1] [i]).
The Board is not at liberty to act in ways that are contrary to the provisions regarding the use and occupancy of the condominium as outlined in the bylaws. Thus, the crux of this action is the provisions restricting the uses to which the residences and common elements may be put.
As set forth in the governing documents, the declaration and bylaws are to be “deemed and taken to be covenants running with the land and shall bind any person having at any time any interest or estate in such Unit, as though such provisions were recited and stipulated at length in each and every deed or conveyance or lease thereof’ (declaration § 15).
“When a party seeks to enforce a restrictive covenant, it must prove the existence and scope of the covenant by clear and convincing evidence” (Liebowitz v Forman, 22 AD3d 530, 531 [2d Dept 2005]; Huggins v Castle Estates, 36 NY2d 427, 430 [1975]; see also Ewing v Watson, 15 AD3d 340 [2d Dept 2005]). As a restrictive covenant, the use limitations are to be strictly construed and any ambiguity resolved against the drafter CBear Mtn. Books v Woodbury Common Partners, 232 AD2d 595 [2d Dept 1996], Iv denied 90 NY2d 808 [1997]). In interpreting a rer strictive covenant, as long as the terms are unambiguous — that is, not capable of being reasonably understood in more ways than one — they must be interpreted in accordance with their plain, ordinary and accepted sense in common speech. The primary objective in construing restrictive covenants is to effectuate the legitimate desires of the contracting parties, as gleaned from the entire context of the covenant (Bovin v Galitzka, 250 NY 228 [1929]).
While restrictive covenants are to be narrowly construed as impeding property rights, courts have enforced limitations on property use to residential purposes only and have blocked efforts of wireless communications companies to install cell towers on properties subject to such restrictions. For example, in Chambers v Old Stone Hill Rd. Assoc. (1 NY3d 424 [2004]), the *869 court directed defendants to remove a cell tower from property that was subject to a restrictive covenant which limited the property’s development to single-family homes. The Court viewed the covenant as having “evinced an intent to limit the area to residential use” (Chambers, 1 NY3d at 430) and ruled that the limitation was reasonable and not an affront to public policy (id. at 431; see also Burke v Voicestream Wireless Corp. II, 207 Ariz 393, 87 P3d 81 [Ct App 2004] [restrictive covenant in deed limiting structures to detached single-family dwellings was a contract between the subdivision’s property owners as a whole and the individual lot owners and prohibited the construction of a cell tower on the subject property]).
The governing documents are unambiguous and, accordingly, the interpretation of their provisions in accordance with their plain meaning is a matter of law for the court. Here, the bylaws created a restrictive covenant which limits the use of all but one unit to residential uses and limits the use of the common elements to uses that are both reasonably suited and incidental to the units’ residential use. Additional evidence that there must be a residential purpose to the use put to the common elements is found in the declaration which states that the building shall be used for only the purposes for which the units contained therein may be used.
To the extent that the Board defendants argue that the cell antennas are reasonably suited for placement on the roof, the court agrees. The real question is the second part of the two-part test, set forth in the bylaws, for the use of the common elements — whether the use is incidental to the use and occupancy of the units, that use and occupancy being almost entirely residential.
“Incident” is defined in Webster’s II New College Dictionary (2d ed 1999) as “something contingent upon or related to something else” (at 559) and “incidental” is defined as “of a minor, causal or subordinate nature” (at 560). Metro cites the on-line Merriam-Webster Unabridged Collegiate Dictionary definition for incident as “something dependent on or subordinate to something else of greater or principal importance” (Metro’s mem of law in opposition at 9).
Defendants argue the cell towers would be a use incidental to residential use because (1) some 17% of property owners no longer use land lines, and (2) the revenues generated by the agreement would be used to reduce the amount the unit owners had to pay toward the condominium’s future maintenance of the common elements. This argument is without merit.
*870 As to the first contention, the only support for the proposition that 17% of property owners rely on cell phones is an article from the New York Times which itself relies on a Nielsen survey. Further, the cited figure is for “American households,” as opposed to households in White Plains, New York, and, in particular, to households living at the Biltmore Towers. More importantly, there is no evidence that Biltmore Towers residents are presently unable to use cell phones from their units or that there is any difficulty with such use.
As to the second contention, the fact that the agreement would generate revenues that would offset future maintenance expenses does not warrant a conclusion that the cell towers are incident to a residential use. If Metro’s reasoning were accepted, then any revenue-producing activity anywhere in or on the building would be incident to residential use. Moreover, the subject use must be incident to the use of the units — not merely just incident to the financial betterment of unit owners.
The Board defendants’ arguments, based on historical examples, fare no better. It is customary for multi-unit dwellings to have a laundry room where washers and dryers are located for residents to use to wash their clothes. It is also customary to charge a fee for the use of laundry machines. Having laundry machines so that residents can wash their clothes is clearly incidental to the residential use of a dwelling. On the other hand, it would be an entirely different matter if the washers were leased out to a laundromat or dry cleaning establishment serving the surrounding area. Likewise, the Board’s permission to allow Verizon FIOS — an Internet service — to install equipment in the common areas and to encourage residents to subscribe to the service resulted in an incidental, residential use, as service was made available to residents and there is no evidence that the equipment installed was for the purpose of providing service to nonresidents. The installation of a satellite radio receiver on the roof so as to permit residents “and . . . those within the receiving parameters of the building” to have satellite radio reception (Palmer off 1i 5 [b]) was also clearly incidental to the residential use. Furthermore, unlike the existing equipment found on the roof of the premises, which is required to be placed on the condominium or within a close vicinity in order for the unit owners to enjoy the services provided (e.g., satellite radio and Verizon FIOS), and, therefore, incident to or ancillary to the residential uses, the cell towers need not be on the building in order to provide, or improve, service to the unit owners.
*871 The court recognizes that some amenities installed for the benefit of building residents may also be available to nonresidents. Thus, it is not inconceivable that a nonresident might use the laundry room or, as a more pertinent example, that, if the building installed a wireless router, the signal might escape the confines of the building and be accessible by someone outside the building. But, importantly, even if some modest or slight use or unpreventable use occurs by others, the reality is that the amenity was provided principally for the use of the residents.
Here, Metro’s placement of cell towers on the condominium’s roof at a rent of $2,300 a month, for the purpose of becoming a provider of wireless communications to a vast area of White Plains, simply cannot be said to be “incident to” the residential use of the condominium’s units, particularly where there is no evidence that the residents presently lack cell service or have complaints about the quality of the cell service that they do have. The number of antennas does not appear to have been selected based upon the needs of the residents, but rather on the desire on the part of Metro to enter this White Plains market as a new wireless communications provider.
Metro’s letter to the White Plains Planning Board makes clear that the agreement was entered into because Metro had a need to provide wireless communication service to an area much greater than the premises in question, i.e., “to provide wireless service to a substantial portion of the City [of White Plains] that includes residences in the Lake Street Area, travelers along Interstate 287, North Broadway and Westchester Avenue, and to surrounding businesses and roads in the vicinity” (see Metro letter to Planning Board of City of White Plains, dated Feb. 28, 2008, attached as exhibit A to exhibit D of affirmation of Kimberly Connick, Esq., dated Aug. 20, 2008 [Connick affirmation]).[17] Thus, the purpose of the installation of the towers on the roof of the building is far broader than merely providing service to building residents and the installation is not limited to the amount of equipment necessary to provide service to the building.
The substantial rental payments that Metro is willing to make to the Board in return for its placement of the eight cell towers *872 on the roof combined with the substantial revenues Metro will receive as a result of the cell service that will be promoted in this area support the conclusion that the agreement is commercial in nature and not incidental to the residential use of the units.
Metro’s reliance on the prior decision in Di Fabio is misplaced. Apart from a vague and glancing reference by plaintiffs counsel to “some restriction” entitling owners to live in a residential building without commercial encroachment (Metro mem of law in opposition at 6 n 1, citing Di Fabio tr at 12), there is no evidence that the issue was briefed to the court and it is not referred to in the text of the decision. Rather, Justice Donovan’s decision appears to rest entirely upon plaintiffs claim that Real Property Law § 339-i (2) prohibited the Board from making an alteration to the common interests (including alterations to the roof) without approval from the affected unit owners (see Con-nick affirmation exhibit B). In response to that argument, Justice Donovan held that only affected unit owners under the statute needed to provide consent and the plaintiff failed to describe the physical alterations that were to be made or how the physical changes would affect his unit. Therefore, neither the plaintiff nor the other unit owners made the requisite showing that they were “affected” within the meaning of the statute such that their consent was required. Justice Donovan also decided that, based on a provision allowing the Board to make alterations and improvements to the common elements and to operate, care and maintain the common elements without unit owner approval, the Board had the authority to enter into the agreement and its decision was protected by the business judgment rule. Here, the issue of whether a commercial use is permitted has been explicitly briefed and argued.
Rescission is a drastic remedy action that seeks to return parties to the status quo by placing them into the same or equivalent position they were in prior to entering into a voidable contract (see Marshall v Alaliewie, 304 AD2d 1026, 1027 [3d Dept 2003] [stating that rescission “is to be invoked only when there is lacking complete and adequate remedy at law and where the status quo may be substantially restored”]). It is a well-settled principle of contract law that “[t]he purpose of rescission is to restore the parties to the contract to the status, as nearly as may be possible, existing at the time immediately prior to the making of the contract” (Carlson v Shepard Pontiac, 63 Misc 2d 994, 996 [Sup Ct, Fulton County 1970]). Though *873 not raised as an issue by defendants, only parties or third-party beneficiaries to a contract have the capacity and standing to seek rescission of a contract (VAC Serv. Corp. v Technology Ins. Co., Inc., 49 AD3d 524 [2d Dept 2008]; Parker & Watchman v Napoli, 29 AD3d 396 [2006], lv dismissed 7 NY3d 844 [2006]). Here, the mere fact that the unit owners hold an undivided interest in the common elements does not confer capacity and standing on them to seek the rescission of the agreement, such relief may only be sought derivatively (see Caprer v Nussbaum, 36 AD3d 176 [2d Dept 2006]). However, the unit owners have a contractual right to enforce the restrictive covenant set forth in the bylaws through a declaration that the Board was without authority to enter into the agreement and an injunction against any attempt by the parties to effectuate the provisions of the agreement. Accordingly, the court declares that the Board was without authority to enter into the agreement since it violates a restrictive covenant limiting the use of the common elements to uses incident to the units’ residential use.[18]
The Claims against the Board Members Individually
In their first and sixth causes of action, plaintiffs seek to recover $1,750,000 in damages based on the individual defendants’ alleged breaches of fiduciary duties by (1) entering into the agreement without proper notice to the unit owners and an opportunity to be heard, (2) not allowing the unit owners to vote on the agreement which was required by the bylaws, and (3) acting outside the scope of their authority. While plaintiffs’ claim is based on fraud and/or mistake, the only allegation of fraud is found in paragraph 38 of the complaint which alleges that
“[t]he Metro and Verizon Leases were entered into either because of the collective fraud of defendants in ignoring and concealing the Leases from the Unit Owners or by the mistaken belief by defendants Metro and Verizon that the Board had the authority to enter into the Leases when it did not.”
Individual board members have fiduciary duties owed to the condominium and its unit owners (see Board of Mgrs. of Fairways at N. Hills Condominium v Fairway at N. Hills, 193 *874 AD2d 322 [2d Dept 1993] [fiduciary duty requires that the board of managers perform their duties in good faith and with the degree of care that an ordinary prudent person in a like position would use under similar circumstances; in accordance with New York law, board members are free from liability for honest but imperfect exercises of the board’s business judgment but could be held individually liable if plaintiff were able to prove self-dealing and bad faith]). Nevertheless, courts will dismiss complaints that fail to allege with specificity independent tortious acts by the board members (see e.g. Felton v 77 Park Ave. Condominium, 38 AD3d 1 [1st Dept 2006]). Plaintiffs’ complaint is devoid of any specific allegations of fraud, self-dealing or other wrongdoing that would support a finding of individual liability against the Board and the Board members.[19] Indeed, the only acts alleged are that the Board members incorrectly construed that they had authority to enter into the agreement. Such a claim cannot support a breach of fiduciary duty as a matter of law (see e.g. Carney v Donley, 261 111 App 3d 1002, 1011, 633 NE2d 1015, 1022 [2d Dist 1994] [“When a board properly exercises its business judgment in interpreting its own declaration, we will not find the board’s interpretation a breach of fiduciary duty”]). Nor does the complaint allege any theory for individual liability against the Board members based on a piercing of the corporate veil. Accordingly, the Board defendants’ motion to dismiss the first and sixth causes of action shall be granted.
Plaintiffs’ Effort to Oust the Individual Defendants from the Board
In their fifth cause of action, plaintiffs seek a mandatory injunction removing the current Board members from their positions on the Board based on their alleged breaches of fiduciary duty (i.e., ignoring the provisions of the bylaws and the provisions found in New York’s Condominium Act and disenfranchising the unit owners by refusing to put the issue to a vote). The Board defendants seek dismissal, arguing that the proper procedure for removal is set forth in the bylaws, which permit the unit holders to remove a Board member from office by a majority vote of the unit owners taken at a meeting. The court
*875 finds that the fifth cause of action does not state a claim upon which relief may be granted. The Board defendants’ acts, while mistaken in the sense that the court disagrees with their claim of authority, have not been shown to be illegal or fraudulent (see Matter of People of State of N.Y. v Ashil Hyde Park, 298 AD2d 393 [2d Dept 2002], lv dismissed 99 NY2d 651 [2003]; 12A Carmody-Wait 2d § 78:117). If plaintiffs wish to remove the individual defendants from office, their recourse is to obtain a majority vote of the unit owners at either a regular or special meeting of the unit owners. Accordingly, the fifth cause of action shall be dismissed.
Plaintiffs’ Claim of Conspiracy to Commit a Tort
Metro moves to dismiss plaintiffs’ third cause of action for conspiracy to commit a tort. The complaint alleges:
“34. Defendants Metro and Verizon had a duty to seek and obtain documentary evidence that the Board of Managers had authority to enter into the Metro Lease and Verizon Lease respectively.
“35. Defendants Metro and Verizon breached their duty by consciously avoiding the issue of whether or not the Board had authority to enter into the Leases; Metro and Verizon failed either to ask for or obtain resolutions or otherwise representations that the Board had authority to act and to enter into the Leases which of course they did not. Defendants Metro and Verizon conspired with the other defendants herein to commit a tort against the plaintiffs.
“36. As a result of the negligence and conspiracy of defendants Metro and Verizon . . . plaintiff has been damaged in an amount to be determined upon the trial of this action but presently believed to be in excess of $1,750,000.”
It is well settled that New York does not recognize civil conspiracy to commit a tort as an independent cause of action (Alexander & Alexander of N.Y. v Fritzen, 68 NY2d 968 [1986]; Pappas v Passias, 271 AD2d 420, 421 [2d Dept 2000]; Steier v Schreiber, 25 AD3d 519 [1st Dept 2006], lv denied 6 NY3d 714 [2006]). Here, since plaintiffs have failed to allege an independent tort committed by Metro, its claim of conspiracy to commit a tort fails as a matter of law and shall be dismissed.
Conclusion
The net result is that plaintiffs are found to be entitled to a declaration that the agreement with Metro is void and to an *876 injunction against the installation of the cell towers. Plaintiffs’ request for a preliminary injunction is moot and should be denied as such. Defendants are entitled to dismissal of plaintiffs’ other claims. Accordingly, this case is now concluded.
For the reasons set forth above, it is hereby ordered that plaintiffs’ motion for partial summary judgment (sequence No. 2) as to their second, fourth and seventh causes of action (i.e., rescission and injunctive relief) against the defendants is granted in part and denied in part; and it is further ordered that plaintiffs’ motion for partial summary judgment on their fourth cause of action for rescission is denied; and it is further ordered that plaintiffs’ motion for partial summary judgment on their second and seventh causes of action is granted; and it is further ordered, adjudged and decreed that the Board of Managers of the Biltmore Towers Condominium Association was without authority to enter into the agreement dated December 8, 2008 with MetroPCS New York, LLC; and it is further ordered, adjudged and decreed that the agreement dated December 8, 2008, between the Board of Managers of the Biltmore Towers Condominium Association and MetroPCS New York, LLC, is null, void and without force and effect; and it is further ordered, adjudged and decreed that defendants Board of Managers of the Biltmore Towers Condominium Association, William Palmer, Jr., Henriette Brooks, Scott Keenan, Barbara McCullough, Edward Rodriguez, Carolyn Roberts, Elizabeth Thompson, and MetroPCS New York, LLC shall be, and hereby are, permanently enjoined from implementing, effectuating, or otherwise putting in force and effect, the agreement dated December 8, 2008, between the Board of Managers of the Biltmore Towers Condominium Association and MetroPCS New York, LLC; and it is further ordered, adjudged and decreed that defendant MetroPCS New York, LLC is permanently enjoined from constructing any cell towers on or in the common elements of the Biltmore Towers Condominium located at 30 Lake Street, White Plains, New York, pursuant to the agreement dated December 8, 2008; and it is further ordered that plaintiffs’ motion for a preliminary injunction (sequence No. 1) is denied as moot; and it is further ordered that the Board defendants’ motion for summary judgment (sequence No. 4) is granted in part and denied in part; and it is further ordered that the Board defendants’ motion is granted to the extent that the first, fifth and sixth causes of action are dismissed with prejudice and Stephen Drago and Biltmore Towers Owners Coalition are dis *877 missed as plaintiffs, but in all other respects, the Board defendants’ motion is denied; and it is further ordered that the motion of MetroPCS New York, LLC for partial summary judgment dismissing the second, third, fourth and seventh causes of action (sequence No. 3) is granted in part and denied in part; and it is further ordered that the motion of MetroPCS New York, LLC for summary judgment is granted to the extent that the third cause of action is dismissed with prejudice, but in all other respects is denied.

. While plaintiffs originally also sought relief against construction of cell towers by New York SMSA Limited Partnership, doing business as Verizon Wireless, improperly named as Verizon, Inc. (Verizon), Verizon terminated its lease to install cell towers on the roof of plaintiffs’ condominium and the action has been discontinued as against Verizon (see affidavit of Robert Marshall, sworn to Sept. 18, 2008 [Marshall off] at 2, n 1).

. While plaintiffs characterize the first cause of action as seeking rescission, the first cause of action actually seeks monetary relief in the amount of $1,750,000 against the individual defendants based on alleged breaches of fiduciary duties. It is the fourth cause of action that seeks a rescission of the agreement.

. Plaintiffs also seek injunctive relief in their second cause of action, and therefore, this decision addresses that cause of action as well.

. The Board defendants assert that Drago no longer owns a unit and the Owners Coalition is not alleged to be a legally recognized association. Plaintiffs have not opposed this aspect of the Board defendants’ motion and, therefore, the court grants it.

. While the complaint alleges that the agreement was entered into on or about December 20, 2007 (complaint H 9), the signature lines suggest that the agreement was fully executed by December 14, 2007.

. A unit owner not only owns the condominium unit purchased, but also owns in common with the owners of all other units an undivided interest in the common elements, those areas outside the units, including the roof to the premises.

. Although not necessary for its claim of rescission, plaintiffs also attach a petition signed by over 50% of the unit owners who are against the installation of the cell towers to show that had the Board followed proper procedure, the vote would not have passed (Marshall off KK 8, 16; exhibit A).

. For example, plaintiffs claim that the Board wrongfully disenfranchised the unit owners by preventing them from having access to the names and addresses of nonresident unit owners by denying plaintiffs’ request for this information “without explanation” (Marshall off UK 10-11; exhibit A). Plaintiffs also alert the court to the default by the defendants in appearing for depositions that plaintiffs noticed on various dates in June 2008 (Marshall off 1Í1Í11-12). Because these issues are unrelated to plaintiffs’ motion for partial summary judgment, the court disregards them for present purposes.

. Metro contends the Di Fabio bylaws are identical to the bylaws here since the Di Fabio bylaws provide at article VIII that the units are to be used only for single-family residential purposes and the common elements “shall be used only for the furnishing of services and facilities for which they are reasonably suited and which are incident to the use and occupancy of units” (see affirmation of Christopher B. Fisher, Esq., dated Aug. 20, 2008; exhibit F).

. In further support of this position, Metro relies on an article from the New York Times, September 17, 2008, entitled Snip! Nearly One-Fifth of Homes Have No Landline (Saul Hansell, Bits Blog, http:// www.bits.blogs.nytimes.eom/2008/09/17/snip-nearly-one-fifth-of-homes-haveno-landline/?scp=l&sq=landline&st=cse), as well as a document which appears to have been retrieved from the Web site of CTIA, the International Association for the Wireless Telecommunications Industry, showing that in December 2007, 15.8% of households were wireless-only households (exhibit D to affirmation of Joshua E. Kimerling, Esq., dated Oct. 3, 2008).

. In support of this argument, Metro cites to a provision in the bylaws that limits the use of the parking (another common element) to residents only (Metro mem of law at 11, citing bylaws, art y § 11 [b]).

. The court notes that Metro provides no factual basis for this assertion, but it is factually supported in the Board defendants’ opposition.

. Given the similarities of cooperatives and condominiums, courts have applied the Levandusky cooperative standard to decisions made by condominium boards and communities governed by homeowners associations (see Captain’s Walk Homeowners Assn, v Penney, 17 AD3d 617 [2d Dept 2005]; Hidden Ridge At Kutsher’s Country Club Homeowner’s Assn, v Chasin, 289 AD2d 652 [3d Dept 2001]; Van Camp v Sherman, 132 AD2d 453 [1st Dept 1987]; Kloppenburg v Loftus, NYU, Nov. 13, 1996, at 35, col 3 [Sup Ct, Suffolk County]).

. “ ‘Every man may justly consider his home his castle and himself as the king thereof; nonetheless his sovereign fiat to use his property as he pleases must yield, at least in degree, where ownership is in common or cooperation with others. The benefits of condominium living and ownership demand no less’ ” (Matter of Levandusky, 75 NY2d at 537, quoting Sterling Vil. Condominium v Breitenbach, 251 So 2d 685, 688 [Fla Dist Ct App 1971]).

. There is no requirement that proof be submitted in the form of an affidavit, as opposed to other acceptable forms, such as deposition testimony (Muniz v Bacchus, 282 AD2d 387 [1st Dept 2001]).

. The rule also precludes the posting of signs or notices on windows or other parts of the building except with Board approval. The exception for Board approved appears only with respect to the sign regulation and does not exist in the prohibition on aerials.

. While the court is not unmindful to Metro’s claim that this site may be the only viable site in this area of White Plains, the fact remains that the site is only available if the Board had the legal authority to enter into the agreement.

. In view of this disposition, it is not necessary to reach plaintiffs’ claim that the agreement should be rescinded on the ground that the Board created a nuisance in violation of declaration 1117 (c) and bylaws, article V § 12 (c).

. The bylaws provide that there is to be no liability of the Board of Managers for errors of judgment except for willful misconduct or bad faith and no liability with respect to any contract made on behalf of the condominium that is within the scope of the Board’s authority (bylaws, art II, § 14).