Darwish Auto Group, LLC v TD Bank, N.A. (2023 NY Slip Op 51160(U))

[*1]

Darwish Auto Group, LLC v TD Bank, N.A.

2023 NY Slip Op 51160(U)

Decided on November 2, 2023

Supreme Court, Albany County

Platkin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 2, 2023
Supreme Court, Albany County

Darwish Auto Group, LLC & DARWISH GENERAL CORP., Plaintiffs,

against
TD Bank, N.A. & WALID DARWISH, Defendants. Walid Darwish, individually and direct and derivative action on behalf of Darwish Auto Group, LLC, DP RE Holdings, LLC and Darwish General Corp., Third Party Plaintiff, Barry Frieder, MARK MANZO, DAVID YUSKO, MELISSA LACARTER, JOHN DOES 1-10, and JANE DOES 1-10, Third Party Defendants.
Walid Darwish, individually and direct and derivative action on behalf of Darwish Auto Group, LLC, DP RE Holdings, LLC and Darwish General Corp., Third Party Plaintiff,
against
Barry Frieder, MARK MANZO, DAVID YUSKO, MELISSA LACARTER, JOHN DOES 1-10, and JANE DOES 1-10, Third Party Defendants.

Index No. 905851-22

ArentFox Schiff, LLP
Attorneys for Plaintiffs and Third Party Defendants
(Michael S. Cryan and Shayshari S. Potter, of counsel)
1301 Avenue of the Americas, 42nd Floor
New York, New York 10019
Archer & Greiner, P.C.
Attorneys for Walid Darwish
(Michael S. Horn and Lilli B. Wofsy, of counsel) 1211 Avenue of the Americas, Suite 2750
New York, New York 10036
Bellavia Blatt, P.C.
Co-Counsel to Walid Darwish
(Steven Blatt, of counsel)
200 Old Country Road, Suite 400
Mineola, New York 11501
John P. Hickey, Esq.
Co-Counsel to Third Party Defendants
PMC, LLC d/b/a Potamkin Auto Group
602 Jeffers Circle, Suite 104
Exton, Pennsylvania 19341

Richard M. Platkin, J.

Defendant/third-party plaintiff Walid Darwish moves by Order to Show Cause dated July 31, 2023 for a preliminary injunction directing plaintiffs and the third-party defendants to restore him to a managerial role over the ten automotive dealerships that are a subject of this litigation (see NYSCEF Doc No. 350 ["Dealership OTSC"]). 
Plaintiffs Darwish Auto Group, LLC ("Darwish Auto") and Darwish General Corp. ("Darwish General") (collectively, "Companies") move separately by Order to Show Cause dated September 12, 2023 for a preliminary injunction restraining Walid Darwish, and those acting in concert with him, from interfering with access to Internet domains used by the automotive dealerships (see NYSCEF Doc No. 453 ["Domains OTSC"]).
BACKGROUND
The Companies own and operate ten automotive dealerships in upstate New York ("Dealerships"). Walid Darwish ("Darwish" or "Defendant") is the sole member of Darwish Auto and the sole stockholder of Darwish General.[FN1]

After negotiating the purchase of the Dealerships and associated real estate, Darwish turned to 2427 Investments, Inc. ("Lender") and DP RE Holdings, LLC ("Secondary Lender") (collectively, "Lenders") for financing. Darwish eventually obtained $62 million from an affiliate of the Lenders pursuant to an Agreement Regarding Borrowing dated April 18, 2022 (see NYSCEF Doc No. 57 ["Borrowing Agreement"]).[FN2]

Under the Borrowing Agreement, Darwish promised that Darwish Auto shall be "governed by an Operating Agreement dated April 18, 2022 entered into by Darwish, its sole member," and Darwish General shall be "governed by a Shareholders Agreement dated April 18, 2022 entered into by Darwish, its sole [shareholder]" (id., §§ 1-2).
Under the April 18, 2022 Operating Agreement for Darwish Auto, management is vested in a committee of three managers, of which no manager may act alone (see NYSCEF Doc No. 52 ["Operating Agreement"], § 3.01). Likewise, Darwish General is governed by a shareholder agreement of April 18, 2022 vesting management in a three-member board of directors, of which no member may act alone (see NYSCEF Doc No. 53 ["Shareholder Agreement"], § 3.01). 
Darwish agreed in writing on April 18, 2022 that the management committee of Darwish Auto and the board of directors of Darwish General (collectively, "Governing Bodies") shall consist of the following three members: Walid Darwish, Barry Frieder and Mark Manzo (see NYSCEF Doc No. 54). The latter two individuals are associated with Potamkin.
As to the Dealerships, "Darwish Auto and Darwish General [maintain that they] own and manage, through their respective [Governing Bodies], each of the Dealerships. The Operating Agreements for each of the Dealerships, each of which was signed by Defendant, provide that the Dealerships are managed by their members, Darwish Auto and Darwish General" (NYSCEF Doc No. 351 ["Frieder Opp. Aff."], ¶ 3; see NYSCEF Doc Nos. 352-361 ["Dealership Operating Agreements"]). 
In July 2022, the Governing Bodies learned that TD Bank had allowed Darwish to modify access rights to the Dealerships' bank accounts ("TD Bank Accounts"). The Governing Bodies responded with a corporate resolution prescribing access rights (see NYSCEF Doc No. 15 ["Resolution"]).
At around the same time, the Governing Bodies directed Darwish to contact and obtain the approvals of Stellantis, Ford, Mitsubishi, Nissan and Volkswagen (collectively, "Manufacturers") to consummate the ownership changes set forth in a Contribution Agreement dated April 18, 2022 ("Manufacturer Approvals") (see NYSCEF Doc No. 56; see also NYSCEF Doc No. 58 ["Contribution Agreement"]).[FN3]
 Darwish also was directed to explore the sale of two underperforming Dealerships.
Plaintiffs commenced this action on August 2, 2022, seeking a preliminary injunction ordering TD Bank to comply with the Resolution. The Court granted the injunction on August 30, 2022, finding that "plaintiffs are likely to succeed in demonstrating that [the Governing Bodies] have the right to determine access to the bank accounts held in the name of [the Companies and] the Dealerships," and "Darwish does not have the unilateral authority to alter access to the accounts absent the approval of [the Governing Bodies]" (NYSCEF Doc No. 34 ["Prior PI Decision"] at 7).
Darwish served an amended answer with counterclaims on September 23, 2022 and commenced a third-party action against Barry Frieder, Mark Manzo, David Yusko and Melissa LaCarter (collectively, "Third Party Defendants") (see NYSCEF Doc Nos. 46-47), all of whom are associated with Potamkin.
Plaintiffs filed an amended complaint on October 13, 2022 (see NYSCEF Doc No. 51 [*2]["Amended Complaint"]) and moved for a second preliminary injunction shortly thereafter (see NYSCEF Doc Nos. 66-71), alleging that Darwish: (i) refused to request Manufacturer Approvals; (ii) modified access rights to the Manufacturers' digital portals ("Manufacturer Portals"); (iii) impeded the efforts of the Governing Bodies to oversee the Dealerships; and (iv) refused to cooperate in exploring the sale of underperforming Dealerships. 
On October 31, 2022, Darwish filed a pre-answer motion under CPLR 3211 (a) to dismiss the Amended Complaint for: (i) failure to bring this action in the State of Delaware; (ii) plaintiffs' lack of standing/capacity to sue Darwish, their sole member and shareholder; (iii) failure to join the Manufacturers as necessary parties; (iv) failure to state a claim; and (v) defenses founded upon documentary evidence (see NYSCEF Doc No. 77).
Prior to oral argument on the motions, the parties agreed to a temporary stipulation governing access rights to the Manufacturer Portals and other books, records and digital accounts (see NYSCEF Doc No. 227 ["Stipulation"]). The parties also agreed to expedited private mediation. 
The case did not resolve through mediation, but plaintiffs did withdraw their second injunction application based on the Stipulation.
In a Decision & Order dated April 26, 2023 (see NYSCEF Doc No. 232 ["MTD Decision"]), the Court denied Darwish's dismissal motion. The Court determined that: New York is a proper forum for this litigation; the Companies have standing to sue Darwish to enforce the Operating Agreement and Shareholder Agreement (collectively, "Governance Agreements"); this action is not subject to dismissal for failure to join the Manufacturers; and the causes of action alleged by plaintiffs are legally sufficient and were not shown to be conclusively defeated by documentary evidence (see id.).
In his answer to the Amended Complaint, Darwish alleges nine counterclaims (see NYSCEF Doc No. 240 ["Answer"]; see also NYSCEF Doc No. 255).
At the July 17, 2023 preliminary conference, the parties stipulated to a scheduling order calling for the completion of written discovery by August 29, 2023, fact discovery by November 30, 2023, and the filing of a note of issue by March 22, 2024 (see NYSCEF Doc No. 256).
Soon thereafter, Darwish filed the Dealership OTSC (see NYSCEF Doc Nos. 257-348), objecting principally to the Third Party Defendants' "unilateral attempts to remove [him] as Dealer Principal and operator of the Dealerships" (NYSCEF Doc No. 346 at 2). Darwish complains that the Third Party Defendants' actions have "change[d] the status quo" and "almost guarantee that the manufacturers will terminate the Dealerships" (id. at 1). 
At a compliance conference held on September 7, 2023, plaintiffs informed the Court that the Dealerships were being denied access to their Internet domain names due to changes made to a certain Go Daddy account controlled by Darwish's son, Jala'a. Plaintiffs filed the Domains OTSC on September 8, 2023, seeking to compel Darwish and Jala'a to recover and transfer back the Go-Daddy account (see NYSCEF Doc Nos. 445-452).
Oral argument on both applications was held on October 4, 2023, and a copy of the argument transcript was filed on October 27, 2023 (see NYSCEF Doc Nos. 498-499 ["Transcript"]). This Decision & Order follows.
LEGAL STANDARD
The purpose of a preliminary injunction is to maintain the status quo and prevent a final [*3]judgment from being rendered ineffectual (see Waldron v Hoffman, 130 AD3d 1239, 1239 [3d Dept 2015]). "[T]he movant must establish (1) a likelihood of success on the merits, (2) irreparable injury absent granting the preliminary injunction, and (3) a balancing of the equities in the movant's favor" (Ruiz v Meloney, 26 AD3d 485, 485-486 [2d Dept 2006]; see Nobu Next Door, LLC v Fine Arts Hous., Inc., 4 NY3d 839, 840 [2005]; see also CPLR 6301). These elements must be established by clear and convincing evidence, which is a "particularly high" burden (Sync Realty Group, Inc. v Rotterdam Ventures, Inc., 63 AD3d 1429, 1431 [3d Dept 2009] [internal quotation marks and citation omitted]). 
I. DEALERSHIP OTSC
Darwish seeks a preliminary injunction restraining the Companies and Third Party Defendants "from directly or indirectly preventing [him] from serving as the Dealer Principal, Member Dealer, Operator and manager of [the Dealerships] . . . to the fullest exten[t] required by manufacturers, lenders and government agencies," together with "reasonable compensation" for such services (NYSCEF Doc No. 258 ["Darwish Moving Aff."], ¶ 2).
A. The Parties' Contentions
1. Darwish's Contentions
Darwish maintains that the Governance Agreements "were never effective" (id., ¶ 4), and a contrary ruling by this Court would cause "a number of the manufacturers [to] terminate" their franchise agreements (id., n 1; see NYSCEF Doc Nos. 275-279 ["Manufacturer Agreements"]). The Manufacturer Agreements are said to identify Darwish "as the only Dealer Principal which means that the manufacturers require that [Darwish has] control over the [Dealerships]" (Darwish Moving Aff., ¶ 9).
Darwish asserts that the "Third Party Defendants have engaged in a campaign to harm the Dealerships which has now resulted in their unilateral attempts to remove [him] as Manager Dealer and operator of the Dealerships" (id., ¶ 14). He cites their involvement in: (i) reducing his compensation and expense reimbursement in April 2023 (see id., ¶ 15); (ii) "conspir[ing]" with the Lenders to declare the Companies in default (id., ¶ 16; see also NYSCEF Doc Nos. 311-312); (iii) misusing court orders (see Darwish Moving Aff., ¶ 17); and (iv) placing armed security guards in the Dealerships, which Darwish describes as an effort "to unilaterally take control of the Dealerships with force" (id., ¶ 18 [emphasis omitted]).
2. The Opposition
Barry Frieder is the president of the Companies and a member of the Governing Bodies (see Frieder Opp. Aff., ¶ 1). He attests that Darwish "has continuously interfered with and refused to follow the Governing Bodies' actions and directives" (id., ¶ 14), citing Darwish's conduct in: (i) restricting access to the TD Bank Accounts (see id., ¶ 15; see also Prior PI Decision); (ii) refusing to cooperate with the Governing Bodies to obtain Manufacturer Approvals (see Frieder Opp. Aff., ¶ 16); (iii) preventing the sale of underperforming Dealerships (see id.); and (iv) denying access to the Manufacturer Portals (see id.). Frieder contends that Darwish's "actions were in furtherance of his scheme to misappropriate Dealership funds" (id.).
Based on the foregoing, the Governing Bodies declared Darwish in default under his employment agreement on September 28, 2022 (see NYSCEF Doc No. 369; see also NYSCEF Doc No. 368 ["Employment Agreement"]).
On the same date and again on March 16, 2023, the Governing Bodies advised Darwish "that his salary and draws exceeded the amounts he was entitled to receive under the terms of his Employment Agreement" (Frieder Opp. Aff., ¶ 18; see also id., ¶¶ 19-20). Darwish also was "warned . . . that his employment would be terminated if he continued to improperly take funds" (id., ¶ 20; see NYSCEF Doc No. 371). Towards the end of April 2023, the Governing Bodies modified access to the Dealerships' payroll accounts to prevent Darwish from taking further draws beyond those permitted under his Employment Agreement (see NYSCEF Doc Nos. 372-373). 
"Nevertheless, Defendant's draws remain outstanding and have not been repaid" (Frieder Opp. Aff., ¶ 22). Specifically, Frieder claims that Darwish received $691,987 in excess draws that have not been repaid (see id.; NYSCEF Doc No. 374). Frieder further complains that Darwish obtained more than $190,000 in unauthorized reimbursements for "personal legal expenses charged to a company credit card" (Frieder Opp. Aff., ¶ 23).
Due to concerns about their lack of access to operational and financial information, the deteriorating financial condition of the Dealerships, and the loss of key personnel, Frieder and Manzo began in-person reviews of the Dealerships in the Spring of 2023 (see id., ¶ 25).
Their first review was conducted on April 11, 2023 (see id., ¶ 26). "Defendant was given notice of the review and proceeded to interfere with the process. [Frieder and Manzo] were denied access to information, bank accounts, and payroll systems" (id.). And when Frieder and Manzo requested access to "specific financial documents, Aubrey Laquidari, the Controller for all of the Dealerships, informed [them] that [Darwish] had told her, in substance, to 'give nothing to [them] and not talk to [them]'" (id.).
"A second in-person mid-year review was planned for July 19, 2023" at the Volkswagen of Schenectady dealership ("VW Dealership") (id., ¶ 27). "The review was again obstructed, this time by Defendant's brother, Liwaa ('Lee') Darwish. Shortly after Lee Darwish arrived at the store, Ms. Laquidari left to avoid a confrontation with him. [Frieder] later learned that Defendant had contacted Ms. Laquidari numerous times that morning directing her not to cooperate with [the review]" (id.). "Throughout the afternoon of July 19th, [Frieder] observed Lee Darwish acting in an intimidating manner, 'standing guard' and following Dealership personnel around the store while they collected information" (id.).
Frieder and Manzo returned to the VW Dealership on July 20, 2023. "The employment of Lee Darwish was to be terminated at that time due to his interference the previous day and attempts to intimidate Dealership personnel" (id., ¶ 28). "As there was significant concern over the safety of Ms. Laquidari and other Dealership personnel as a result of the actions taken by Defendant and Lee Darwish, Manzo and [Frieder] decided to retain the services of Pinkerton Consulting and Investigations, Inc. to provide security services during the course of [their] review and the termination of Lee Darwish's employment" (id.; see NYSCEF Doc No. 375).
Plaintiffs believe, based on the preliminary review, "that there is a high likelihood that Defendant has misappropriated substantial assets of the Dealerships in numerous ways without the knowledge or consent of the Governing Bodies" (Frieder Opp. Aff., ¶ 29). Frieder points to evidence showing that: (i) Darwish took a $3.75 million advance against future profits from the Ford Dealerships (see id., ¶¶ 30-32; NYSCEF Doc Nos. 376-378); (ii) "Defendant has been directing manufacturers to make factory incentive payments directly to him, bypassing the [*4]Dealerships and their accounting systems" (Frieder Opp. Aff., ¶¶ 33-34; see NYSCEF Doc Nos. 379-380); (iii) Darwish secretly formed an offshore captive reinsurer funded by the Dealerships' sale of finance and insurance products (see Frieder Opp. Aff., ¶¶ 35-37; NYSCEF Doc Nos. 381-386); and (iv) Darwish obtained a $900,000 advance from Stellantis "without the knowledge or consent of the Governing Bodies" (Frieder Opp. Aff., ¶ 38; see NYSCEF Doc No. 387). 
"[T]he mid-year review [also] has uncovered that employee morale has deteriorated due to Defendant's actions" (Frieder Opp. Aff., ¶ 39). "[A] significant number of employees [were] laid off by Defendant without replacement and many other [key] employees have quit or threatened to quit" due to Darwish's mistreatment of them and his unilateral decision to "reduce[] pay plans for sales and service personnel and managers" (id. [providing examples]).
"Under no circumstances can the Governing Bodies allow the Dealerships to be overrun by a rogue member who misappropriates Dealership assets, refuses to follow directives of, or cooperate in any way with, the Governing Bodies, mismanages the Dealerships, and mistreats Dealership employees" (id., ¶ 41). 
Plaintiffs terminated Darwish's employment for cause on July 19, 2023 (see id., ¶¶ 42-43; see also NYSCEF Doc Nos. 392-394). Nonetheless, Frieder insists that "Defendant is still a member of the Governing Bodies. He continues to receive daily information reports and has access to the books and records of the Dealerships" (Frieder Opp. Aff., ¶ 44). "Defendant has not been excluded from participating in the management of the Dealerships, but he is required to report to the Governing Bodies and comply with . . . the terms of the Operating Agreement for each Dealership, the Operating Agreement and the Shareholders Agreement" (id., ¶ 45 [record citations omitted]).
3. Darwish's Reply
Darwish argues that the Third Party Defendants have unilaterally and inappropriately altered the status quo by preventing him from serving in the Dealer Principal role required under the Manufacturer Agreements (see NYSCEF Doc No. 410 ["Darwish Reply Aff."], ¶¶ 3-60). He cites: (i) his demotion from president to vice-president (see id., ¶ 7; see also NYSCEF Doc No. 411); (ii) his exclusion from decisions about certain Ally Bank agreements (see Darwish Reply Aff., ¶ 8), which relate to floorplan financing, motor vehicle leases, and the finance and insurance products sold by the Dealerships (see NYSCEF Doc No. 412); (iii) his lack of meaningful participation in the decisions of the Governing Bodies (see Darwish Reply Aff., ¶ 9); and (iv) the denial of reasonable compensation and reimbursement for "legal costs expended in defending the Companies" (id., ¶¶ 11-12).
Darwish insists that he has "served as, and [is] obligated to be, the point of contact with the Manufacturers" in his role as the Dealer Principal (id., ¶ 13). Further, the Manufacturer Agreements are said to oblige Darwish to maintain "a constant physical presence" at the Dealerships (id., ¶ 14; see also id., ¶¶ 15-16). 
As to imminent harm, Darwish cites a lawsuit filed by Volkswagen on August 4, 2023 "seeking to rescind the [Volkswagen] Dealer Agreement, or alternatively, preventing any individual other than [Darwish] from exercising ownership or control" (Darwish Reply Aff., ¶ 29; see NYSCEF Doc No. 421 ["VW Complaint"]).
Darwish denies having received advance notice of the April 2023 Dealership visit, and he claims that "[a] large number of people, including Manzo and Frieder, arrived at the Dealerships [*5]which caused harm and disruption since they failed to coordinate their visit" (Darwish Reply Aff., ¶ 46). "This surprise visit scared employees and created a distraction. Employees speculated that the individuals were from the government, while others speculated that the Dealerships were in jeopardy. A surprise visit is not productive" (id., ¶ 48). Darwish also complains that Manzo and Frieder made "demands for documents from employees beyond the scope of the [Stipulation]" (id., ¶ 47).
Relatedly, Darwish asserts that he is the one being denied access to information concerning the Dealerships, including: (i) the used car inventory system (see id., ¶¶ 17-18); (ii) the ability to communicate directly with Dealership personnel (see id., ¶¶ 19, 22-23); and (iii) daily reports regarding the activities of the Dealerships (see id., ¶¶ 20-21).
Darwish denies any misuse or misappropriation of Dealership funds (see id., ¶ 56). The $3,750,000 advance from Ford is said to "remain in a proper account to pay back the advance" (id., ¶ 57); Darwish is not using the $900,000 Stellantis advance (see id., ¶ 59); he received the factory incentive payments as an award for winning "competitions that the Manufacturers have between Dealer Principals" (id., ¶ 60); and the formation of the offshore reinsurer was "normal for Dealer Principals" (id., ¶ 63), and the bulk of the reinsurer's funds are being held as future-claims reserves (see id., ¶¶ 64-66).
Finally, Darwish insists that the Third Party Defendants are destroying the Dealerships. He maintains that the Dealerships were profitable under his supervision and "the employees seemed happy and enjoyed working" (id., ¶¶ 50-51). Under the management of the Third Party Defendants, however, used vehicle prices are being reduced to unreasonably low levels (see id., ¶¶ 30-32), and new car sales have "tanked" (id., ¶ 34), leading to a substantial decline in Dealership revenues and profits (see id., ¶ 35).
B. Likelihood of Success
A "party seeking a preliminary injunction must demonstrate a probability of success on the merits" (Nobu Next Door, 4 NY3d at 840). "The existence of a question of fact does not prevent a party from establishing a likelihood of success on the merits; success need not be a certainty to obtain a preliminary injunction" (Petry v Gillon, 199 AD3d 1277, 1278-1279 [3d Dept 2021] [internal quotation marks and citation omitted]). 
1."Never Effective"
As an initial matter, Darwish has not demonstrated a reasonable probability of success in establishing that the Governance Agreements "were never effective" and that the "parties had conducted themselves, until just prior to this lawsuit, as if the original entity documents were governing and effective" (Darwish Moving Aff., ¶ 4).
These contentions first were addressed in the Prior PI Decision, in which the Court ruled, based on the express terms of the Governance Agreements, that "plaintiffs are likely to succeed in demonstrating that their respective [Governing Bodies] have the right to determine access to the bank accounts held in the name of plaintiffs or the Dealerships" (Prior PI Decision at 7).
The Court returned to this issue in its MTD Decision. In declining to dismiss the Amended Complaint under CPLR 3211 (a) (1), the Court recognized that the original governance documents relied upon by Darwish — the operating agreement for Darwish Auto dated June 21, 2021 (see NYSCEF Doc No. 127) and the corporate bylaws for Darwish General dated June 25, 2021 (see NYSCEF Doc No. 128) — "were superseded by the Governance Agreements that [*6]Darwish signed on April 18, 2022" (MTD Decision at 12). 
By their express terms, the April 18, 2022 Governance Agreements "constitute[] the sole and entire agreement of the [parties] with respect to the subject matter contained . . . therein, and supersede[] all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to the subject matter" (Operating Agreement, § 11.12; Shareholder Agreement, § 11.12). 
Further, Darwish did not supply any documentary evidence on the prior motion practice to support "his conclusory assertion that the Operating Agreement and Shareholder's Agreement 'were never effective' and 'were never used to govern the relevant businesses'" (MTD Decision at 12). 
Darwish has not tendered any new legal arguments or supplied any new evidence to support his claim that the Governance Agreements were never effective. He continues to rest on the same self-serving and highly conclusory attestations, which are unsupported by documentary evidence (see Darwish Moving Aff., ¶¶ 3-5; NYSCEF Doc No. 274, ¶ 9). 
As such, the Court finds that Darwish has not demonstrated a reasonable probability of establishing that the Governance Agreements were never effective.
2. The Dealership LLCs
Plaintiffs contend that "[t]he Operating Agreements for each of the Dealerships, each of which was signed by Defendant, provide that the Dealerships are managed by their members, Darwish Auto and Darwish General" (Frieder Opp. Aff., ¶ 3).
Darwish previously argued that the Dealership Operating Agreements identify him as "the only manager" (NYSCEF Doc No. 87, ¶ 27), relying on his designation as the "initial limited liability company member" (see e.g. NYSCEF Doc No. 352, ¶ 2). However, based on language within same operating agreements identifying Darwish General and Darwish Auto as the "limited liability company member[s]" who made "capital contribution[s]" (see e.g. id., ¶ 3), the Court concluded that "the operating agreements for the Dealership LLCs do not conclusively refute plaintiffs' allegation that the management of the Dealerships is vested in the Governing Bodies" (MTD Decision at 11).
Although the Dealership Operating Agreements are not a model of drafting clarity, the Court finds that Darwish has not demonstrated a likelihood of success in establishing that he is a member or manager of the Dealership LLCs. The operating agreements plainly draw a distinction between Darwish's role as the "initial . . . member" (NYSCEF Doc No. 352, ¶ 2), versus the role of Darwish General and Darwish Auto as current "member[s]" who have made "capital contribution[s] . . . in exchange for their LLC ownership" (NYSCEF Doc No. 352, ¶ 3; but see NYSCEF Doc No. 354, ¶ 3 [operating agreement for WD Amsterdam LLC]).
This construction of the Dealership Operating Agreements is consistent with the Borrowing Agreement, signed by Darwish on April 18, 2022, which provides that "[e]ach of the Dealership Companies is managed by its members, [Darwish Auto] and [Darwish General]" (Borrowing Agreement, § 3). The Governing Bodies "shall each have the right, power and authority to make all decisions on behalf of each of the Dealership Companies, including . . . all decisions regarding the acquisition, management . . . , operations, financing, accounting and sale of any or substantially all . . . of their assets" (id.). 
The Court therefore finds that Darwish is not likely to succeed in establishing that the [*7]Dealerships are managed by anyone other than Darwish Auto and Darwish General.
3. "Oppression"
Darwish argues, largely in reply, that even if he is "viewed as a non-controlling shareholder/member of the Companies, he is still likely to succeed on the merits of his breach of fiduciary duty counterclaims, since he is being oppressed" (NYSCEF Doc No. 405 at 8-12; see Answer, ¶¶ 119-125).[FN4]

The authorities relied upon by Darwish involve Business Corporation Law ("BCL") § 1104-a (a) (1), which authorizes a minority shareholder with at least 20% of the voting interest in a corporation to petition for judicial dissolution on the ground that the "directors or those in control of the corporation have been guilty of illegal, fraudulent or oppressive actions toward the complaining shareholders." In this context, "oppressive actions" refers to conduct that substantially defeats the reasonable expectations of the minority shareholder:
A court considering a petition alleging oppressive conduct must investigate what the majority shareholders knew, or should have known, to be the petitioner's expectations in entering the particular enterprise. Majority conduct should not be deemed oppressive simply because the petitioner's subjective hopes and desires in joining the venture are not fulfilled. Disappointment alone should not necessarily be equated with oppression. Rather, oppression should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the venture (Matter of Kemp & Beatley [Gardstein], 64 NY2d 63, 73 [1984]).
As stated above, plaintiffs are likely to succeed in demonstrating that the April 18, 2022 Governance Agreements vest management of the Companies in their Governing Bodies, and the Dealership Operating Agreements vest management of the Dealerships in the Companies, acting through the Governing Bodies (see Part I [B] [1]-[2], supra). This is consistent with the Borrowing Agreement, also signed by Darwish on April 18, 2022. 
Additionally, Darwish's Employment Agreement of April 18, 2022 required him to report to the Governing Bodies and allowed them to "extend[] or curtail[]" his "responsibilities . . . from time to time in their discretion" (Employment Agreement at 1). Darwish was obliged to "follow all policies and procedures adopted by the Governing [Bodies]," as well as "policies and procedures established from time to time by [the Lenders]" (id.). And while Darwish had an initial one-year term of employment, during which he could be terminated only for cause, Darwish thereafter became an "employee 'at will'" of the Companies, and "all compensation and other benefits [could] be terminated at any time with or without cause" (id. at 3).
Darwish has not explained how he could have had any reasonable expectation of governance, management or employment rights beyond those conferred by the Governance Agreements, Employment Agreement, Borrowing Agreement and Contribution Agreement.
However, Darwish is on somewhat stronger ground when it comes to expectations formed through the Manufacturer Agreements, which, to varying degrees, contemplate his active [*8]involvement in the operations and management of the Dealerships. 
For example, under the Dealer Sales and Service Agreement with Mitsubishi Motors, Darwish is identified as the "Dealer Principal" and "Owner," and the agreement prohibits any "change in the ownership . . . which results in a change in majority control or interest . . . without the prior written approval of [Mitsubishi]" (NYSCEF Doc No. 275). The same agreement represents that Darwish, as Dealer Principal and Executive Manager, has complete decision-making authority over dealership operations (see id.).
The agreement with Nissan similarly designated Darwish as Principal Owner and Executive Manager, declared that Nissan has no obligation to transact business with anyone other than the Principal Owner or Executive Manager, and provides that the Executive Manager shall have full managerial authority over dealership operations and be physically present at the dealership (see NYSCEF Doc No. 278).
Likewise, Stellantis entered into its dealership agreements in reliance "on the active, substantial and continuing personal participation in the management of Dealers's organization" by Darwish, who is designated as "Dealer Principal" (NYSCEF Doc Nos. 276-277).
But any expectations that Darwish derived from the Manufacturer Agreements cannot be viewed in isolation from the host of promises regarding ownership and governance that Darwish made to the Lenders to obtain the financing needed to purchase the Dealerships. In fact, the Manufacturer Agreements were not fully executed until after Darwish bound himself to the Governance Agreements, the Borrowing Agreement, Contribution Agreement (collectively with the Borrowing Agreement, "Financing Agreements") and Employment Agreement.[FN5]
 
Nor can Darwish's expectations regarding his role in managing and operating the Dealerships be divorced from the countervailing expectations regarding his own conduct established by the Governance and Financing Agreements. These agreements plainly contemplated — and, in fact, required — Darwish to comply with the governance structure to which he assented, adhere to the directives issued by the Governing Bodies, and act as a responsible steward of the Dealerships and their resources. Plaintiffs did not find these expectations to have been met, and Darwish offers no convincing basis for the Court to find otherwise.
Thus, even assuming that principles of shareholder "oppression" under BCL § 1104-a (a) (1) are applicable to Darwish's claim for breach of fiduciary duty, Darwish has not demonstrated a reasonable probability of success on such a claim.
4. Governance Issues
Darwish asserts, for the first time in reply, that the Third Party Defendants "do not invite [him] to meetings or allow [him] to vote" (Darwish Reply Aff., ¶ 9). Relatedly, Darwish complains that he was denied "administrative access to the used car [computer] system" (id., ¶ 17); and Dealership employees have been instructed not to share reports or otherwise communicate directly with him (see id., ¶¶ 20-23).
Even if these complaints had been properly raised in his initial moving papers, Darwish has not demonstrated a reasonable probability of success. The issue about access to the used car [*9]system clearly pertains to Darwish's lack of managerial authority (see id., ¶ 17 [administrative access allowed Darwish to "set vehicles for wholesale" and "fix wholesale prices"]), and plaintiffs have tendered legitimate reasons for restricting Darwish's direct communications with Dealership personnel. Darwish's remaining complaints are simply a product of the Governance Agreements to which he assented.
C. Irreparable Harm
A movant for a preliminary injunction must establish that it is likely to suffer imminent and irreparable harm absent the requested relief. Irreparable harm means an injury for which a monetary award alone cannot be adequate compensation (see Town of Liberty Volunteer Ambulance Corp. v Catskill Regional Med. Ctr., 30 AD3d 739, 740 [3d Dept 2006]), and the prospect of such harm "must be imminent, not remote or speculative" (Matter of P. & E. T. Found., 204 AD3d 1460, 1461 [4th Dept 2022] [internal quotation marks and citation omitted]). 
1. The Manufacturer Agreements
Darwish contends that his ownership interest in the Companies will be rendered "nearly valueless" if he is not permitted to operate the Dealerships (NYSCEF Doc No. 346 at 9). Darwish relies on language in the Manufacturer Agreements obliging him to serve in a Dealer Principal role and prohibiting the assignment or delegation of such role (see id. at 5-6). Darwish argues that Volkswagen already is in the process of seeking to terminate its franchise, and Nissan and other manufacturers may soon follow suit (see id.).
Plaintiffs respond that "the prospect of manufacturer termination is an issue created entirely by Defendant's baseless refusals to notify and request approval from the manufacturers for the agreed-upon change in control and ownership of the Dealerships" (NYSCEF Doc No. 400 at 15). "Any attempt [by a Manufacturer] to terminate [its franchise agreement] will not have any immediate impact on Dealership operations," as there is "no evidence that any termination can be supported once the appropriate requests are submitted and approved by Volkswagen and other manufacturers" (id.; see Vehicle and Traffic Law ["VTL"] § 463 [2] [e] [1]). "Submission of the requests is within Defendant's control" (NYSCEF Doc No. 400 at 15).
Leaving aside the self-created nature of the harm claimed by Darwish, an issue more appropriately considered in balancing the equities (see Part I [D], infra), the Court finds that there is a real and substantial prospect that one or more Manufacturers may terminate their franchise agreements for breach. However, this harm has not been shown to be imminent, and it may occur even if an injunction is granted.
Of the five Manufacturers, only one has taken concrete steps to terminate its franchise. On October 21, 2022, Volkswagen rejected plaintiffs' request for approval of the governance and ownership changes to be made by the Contribution Agreement because the request did not originate with Darwish, its Dealer Principal (see NYSCEF Doc No. 304). On the same date, Volkswagen gave notice of franchise termination, but, through a series of extension agreements, tolled the effectiveness of the termination until "48 hours after any order or ruling that confirms or gives any other person or entity other than Walid Darwish control or ownership of [the VW Dealership] or changes the status quo in anyway" (NYSCEF Doc No. 342). 
On August 4, 2023, Volkswagen sued the VW Dealership in Supreme Court, Westchester County (see Index No. 64673/2023 ["VW Action"]), seeking a declaration that the only approved ownership and management structure for the VW Dealership is that set forth in the franchise [*10]agreement (see VW Complaint, ¶¶ 31-36; see also NYSCEF Doc No. 279 ["VW Agreement"]). Volkswagen also seeks recission of the agreement based upon the VW Dealership's failure to disclose the Contribution Agreement, which was signed 11 days prior (see VW Complaint, ¶¶ 14-23, 38-45).
The continued prosecution of the VW Action plainly creates a serious risk that the VW Dealership may lose its franchise, thereby causing irreparable harm to the Companies and Darwish. But nothing in the docket of that action suggests that such harm is imminent. Under the parties' stipulated scheduling order, the note of issue is not due to be filed until August 15, 2024 (see VW Action, NYSCEF Doc No. 41 at 10). And while Volkswagen has expressed a desire to pursue preliminary injunctive relief, it appears that such relief would be directed at restoring Darwish to the role of Dealer Principal, not a mandatory injunction terminating the Dealership franchise, pendente lite.
Moreover, based on its allegations of fraudulent concealment, Volkswagen claims an entitlement to recission of the VW Agreement regardless of whether or not Darwish is restored to a managerial role at the VW Dealership (see VW Complaint, ¶¶ 45-46). Thus, the irreparable harm that Darwish seeks to avoid through a preliminary injunction may come to pass in any event.
The only other specific Manufacturer threat cited by Darwish is a November 3, 2022 letter from Nissan's counsel, which raised issues similar to those alleged in the VW Complaint (see NYSCEF Doc No. 307). However, that letter is from one year ago, and Nissan stopped short of taking any "immediate action" at that time (id. at 3).
Accordingly, while plaintiffs' decision to remove Darwish from the management and operations of the Dealerships exacerbates the risk that valuable Dealership franchises may be lost to termination, Darwish has not adequately established that the preliminary injunction he seeks is necessary to prevent imminent and irreparable harm or that the requested injunction would, in fact, prevent such harm.
2. Management of the Dealerships
In reply, Darwish shifts the focus of his argument to the contention that "[t]he Companies will suffer irreparable harm [absent a preliminary injunction] since they are being destroyed by the [Third Party Defendants]" (NYSCEF Doc No. 405 at 12). Darwish claims, in essence, that the Third Party Defendants are intentionally harming the Dealerships and causing them "to lose millions of dollars" in an effort to "force a sale" (id. at 13).
The Court has no doubt that the loss of a business, customers or goodwill may constitute irreparable harm sufficient to warrant preliminary injunctive relief. But Darwish offers little in the way of evidence to support his claim that the Third Party Defendants are intentionally damaging the Dealerships to force a sale. And the limited evidence that Darwish does rely upon was submitted for the first time in reply (see Darwish Reply Aff., ¶¶ 30-40; NYSCEF Doc Nos. 422-428, 439).
Further, Darwish has not addressed the host of other factors that may be causing or contributing to the poor fiscal and operational performance of the Dealerships, including: (i) the larger market forces affecting vehicle prices and sales; (ii) the internal dissension and division within the Dealerships engendered by the parties' acrimonious relationship, together with the resulting turnover of Dealership personnel; and (iii) the financial improprieties alleged by [*11]plaintiffs, which involve the diversion of significant financial resources away from the Dealerships.
D. Balancing of the Equities
A preliminary injunction is an equitable remedy that will be granted only where the balance of equities tips in favor of the requested relief. "The probability of hardship to each of the parties from the grant or denial of the application must be weighed in the balance" (Finger Lakes Health Sys. Agency v St. Joseph's Hosp., 81 AD2d 403, 407 [3d Dept 1981], lvs denied 55 NY2d 606, 607 [1982]), and the Court must "inquire into whether the irreparable injury to be sustained . . . is more burdensome [to Darwish] than the harm caused to [plaintiffs and the Third Party Defendants] through imposition of the injunction" (Eastview Mall, LLC v Grace Holmes, Inc., 182 AD3d 1057, 1059 [4th Dept 2020] [internal quotation marks and citation omitted]).
Initially, the Court finds that both sides bear some measure of responsibility for the prospect that the Manufacturers may terminate their franchise agreements for material breach or fraudulent inducement. Although the financing and ownership structure objected to by the Manufacturers undoubtedly originated with the Third Party Defendants and their lawyers, Darwish was a willing, and apparently knowing, participant.
On April 18, 2022, Darwish signed the Governance Agreements, which vested management of his Companies and the Dealerships in the Governing Bodies, of which he possesses only a minority voice. On the same date, Darwish signed the Contribution Agreement, which is intended to leave Darwish with only an indirect, minority interest in the Dealerships once fully effective. And just 11 days after agreeing to these ownership and governance agreements, Darwish executed the VW Agreement on behalf of the VW Dealership (see VW Agreement at 4). 
But while both sides bear some responsibility for the prospect of irreparable harm, Darwish is the only party who can initiate the process of repairing relationships with the Manufacturers by formally requesting their consent to the governance and ownership changes worked by the Governance and Financing Agreements (see NYSCEF Doc Nos. 304-306). 
And if Darwish applies for the Manufacturer Approvals — as the Governing Bodies directed him to do back in July 2022, more than 15 months ago, and as expressly contemplated by the Contribution Agreement (see § 5) — the Manufacturers will be bound by VTL § 463 (2) (k), which prohibits them from unreasonably withholding consent. This does not guarantee that efforts at a cure would be successful, but Darwish is the only one who can begin that dialogue with the Manufacturers.
The Court therefore finds that the irreparable harm that Darwish seeks to avoid largely is self-created, which does not tip the balance of equities in his favor (see Chambers v Old Stone Hill Rd. Assoc., 1 NY3d 424, 434 [2004]; Sync Realty Group, 63 AD3d at 1431).[FN6]

The Court recognizes that plaintiffs' decision to remove Darwish from the day-to-day affairs of the Dealerships has exacerbated problems with the Manufacturers, particularly [*12]Volkswagen. And the Court is mindful that the equities ordinarily tip in favor of preserving the status quo. Nonetheless, this is an unusual case, because an injunction temporarily restoring Darwish to a managerial role may itself cause irreparable harm.
Plaintiffs have tendered credible evidence showing that Darwish may have used his role as Dealer Principal to direct to himself millions of dollars in Manufacturer funds intended for the Dealerships and Dealership personnel (see Frieder Opp. Aff., ¶¶ 30-33, 38; NYSCEF Doc Nos. 376-378, 387). Notably, Darwish does not deny having directed such funds to himself or being in possession of such funds (see NYSCEF Doc No. 405 at 4-5; Darwish Reply Aff., ¶¶ 57, 59-60). Darwish merely claims that such transactions were "normal for Dealer Principals" (Darwish Reply Aff., ¶ 63), and he expresses some willingness and ability to return certain of the funds (see id., ¶¶ 57, 59)
Darwish's track record of refusing to follow the directives of the Governing Bodies further counsels against an injunction restoring him to a managerial role (see Part I [A] [2], supra). The Court has no confidence that Darwish would operate the Dealerships in accordance with the duly-adopted directives of the Governing Bodies. Further, given the parties' severely deteriorated relationship, the Court is doubtful that the parties could work together in a cooperative and constructive manner, at least at the present time.
The Court therefore finds that the equities do not favor Darwish's request for a preliminary injunction to avoid harms that are largely self-created, particularly where the preliminary injunction may itself cause irreparable harm to plaintiffs and the Dealerships.
E. Conclusions
Darwish has not demonstrated a reasonable probability of success on his claims that the Governance Agreements were never effective or that he is an oppressed minority shareholder/member. Nor has Darwish shown that he is likely to succeed in establishing that he is the authorized manager of the Dealerships or that he is being denied management rights granted to him by the Governance Agreements.
Darwish has shown the prospect of irreparable harm through the potential loss of Dealership franchises, but that harm has not been shown to be imminent.
Further, the harm that Darwish seeks to avoid largely is self-created, and the requested injunction may itself cause irreparable harm to the Companies and Dealerships. As such, Darwish has not shown that the balance of equities tips in favor of preliminary injunctive relief, even an injunction limited to restoring the status quo.
Accordingly, even under the lesser standard of proof cited by Darwish where "the denial of a preliminary injunction would disturb the status quo and render a final judgment meaningless" (NYSCEF Doc No. 346 at 8), the Court finds that the requested relief must be denied.
II. DOMAINS OTSC
On September 8, 2023, plaintiffs moved for a preliminary injunction directing Darwish and those acting in concert with him, including his son, Jala'a, to: (i) refrain from interfering with a certain Go-Daddy account that controls the Dealerships' Internet domain names ("Account"); (ii) recover and transfer back the Account; and (iii) refrain from altering access to the Account, except as authorized by the Governing Bodies (see Domains OTSC).
During the pendency of the motion practice, the Account was restored (see NYSCEF Doc [*13]No. 489, ¶ 14), leaving for determination only the branch of the motion seeking to restrain Darwish and those acting in concert with him from making any further changes to the Account.
Plaintiffs lack any direct evidence of Darwish's involvement in the loss of access to the Account. The Account was in the name of Darwish's son (see NYSCEF Doc No. 460, ¶¶ 3-6), and the record shows that the son may have had his own motives for altering access (see id., ¶ 8; see generally NYSCEF Doc No. 459 at 4, 13). 
Nonetheless, given the parties' prior history concerning accounts (see e.g. Prior PI Decision) and for the avoidance of any doubt or further controversy, all parties to this action and all persons acting in concert with them shall be restrained from altering access or having others alter access to the Account, except as may be authorized in writing by the Governing Bodies (see generally Ricatto v Ricatto, 4 AD3d 514, 516 [2d Dept 2004]). 
III. CASE MANAGEMENT
Restoring Darwish to a managerial role over the Dealerships would not be a provident exercise of the Court's equitable discretion (see Part I [E], supra). But given the looming threats to the Manufacturer Agreements, the Dealerships' poor performance, and the high level of acrimony and hostility between the parties, something must be done (see Transcript at 67 ["(Q)uite frankly, I don't think the dealerships are going to make it until next fall."]).
In the Court's view, the only reasonable and realistic path forward is an expedited judicial determination of the parties' rights and responsibilities under the Governance and Financing Agreements. If those agreements mean what they say, then Darwish will be obliged to comply with the Governing Bodies' directive that he apply to the Manufacturers for approval of the governance and ownership changes worked by the agreements, thereby beginning the cure process. And if Darwish is proven correct in his contention that the subject agreements were never effective or are otherwise unenforceable, the parties will need to address the issues raised by this action in a much different fashion.
At oral argument, the Court broached the prospect of expedition. Plaintiffs and the Third Party Defendants were receptive (see id. at 67-69). Darwish's counsel also expressed his "willing[ness] to work as hard as possible to get this done as soon as possible," but properly observed that discovery will be voluminous and complex, and likely will require significant judicial supervision (id. at 69-70).
Under the circumstances, Court finds that this is an appropriate case to appoint a special master to provide intensive supervision of the disclosure process (see CPLR 3104 [a]; see also 22 NYCRR 202.14), with the goal of completing fact discovery in three months. Although a judicial hearing officer ("JHO") may be designated to serve in such a capacity, the Court believes that the parties would be better served by "stipulat[ing] that a named attorney [shall] act as referee" and "provid[ing] for the payment of [such referee's] fees" (CPLR 3104 [b]). But if the parties are unwilling or unable to so stipulate, a JHO, presumably Albany-based, can be assigned.
The parties are directed to confer regarding an expedited schedule for discovery to be conducted under the supervision of a special master/referee and report back to the Court.
CONCLUSION
Based on the foregoing, it is
ORDERED that the Dealership OTSC is denied; and it is further
ORDERED that the Domains OTSC is granted to the limited extent of directing all [*14]parties to this action, and those acting in concert with them, to refrain from altering access, or having others alter access, to the Account, except pursuant to the written direction of the Governing Bodies; and finally it is
ORDERED that, by November 9, 2023, counsel shall confer regarding an expedited schedule for fact discovery to be conducted under the supervision of a special master/referee and propose an appropriate stipulation to the Court (or provide a joint report regarding the parties' progress in arriving at such a stipulation).
This constitutes the Decision & Order of the Court, the original of which is being uploaded to NYSCEF for entry by the Albany County Clerk. Upon such entry, counsel for plaintiffs shall promptly serve notice of entry on all parties entitled to such notice.
Dated: Albany, New York
November 2, 2023
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 258-348, 350-400, 405-439, 446-453, 459-491, 498-499.[FN7]

Footnotes

Footnote 1: The other defendant, TD Bank, N.A., has not appeared in this action. 

Footnote 2: The Lenders and their affiliates are themselves affiliates of the Potamkin Automotive Group ("Potamkin").

Footnote 3: The closing on the Contribution Agreement "will occur when the manufacturer approvals required under applicable laws to implement the change in ownership of the Dealership[s] pursuant to this Agreement [have] been obtained" (Contribution Agreement, § 5).

Footnote 4: The counterclaim identifies a handful of breaches, but "oppression" is not among them (see id.).

Footnote 5: The Mitsubishi dealer agreement was signed by Darwish on January 25, 2022 but not counter-signed until May 2, 2022 (see NYSCEF Doc No. 275 at 6). 

Footnote 6: Likewise, Darwish's complaints of being an oppressed shareholder stem directly from the contractual agreements and promises he made to the Lenders to obtain financing. His claim is, in essence, one of contractual self-oppression.

Footnote 7: The Court takes judicial notice of the prior filings and proceedings in this action and the related action(s) (see Matter of Shirley v Shirley, 101 AD3d 1391, 1394 [3d Dept 2012]; Casson v Casson, 107 AD2d 342, 344 [1st Dept 1985], appeal dismissed 65 NY2d 637 [1985]).